595 F.2d 1099
 Mary OLSEN, Plaintiff-Appellant Cross-Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees Cross-Appellants,
v.
ARGONAUT INSURANCE COMPANY, Intervenor-Appellant.
Christine W. CARVIN, Plaintiff-Appellant Cross-Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Third-Party Plaintiffs
Appellees-Cross-Appellants,
v.
TELEDYNE MOVIBLE OFFSHORE, INC., et al., Third-Party
Defendants-Appellees Cross-Appellants,
Argonaut Insurance Company, Intervenor-Appellant.
Frank Winston BOOKER et al., Plaintiffs-Appellees,
v.
SHELL OIL COMPANY et al., Defendants-Appellants.
Gordon Davis WALLACE, Plaintiff-Appellant Cross-Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees Cross-Appellants,
v.
ARGONAUT INSURANCE COMPANY, Intervenor-Appellant.
ARGONAUT INSURANCE COMPANY, Plaintiff-Appellant Cross-Appellee,
v.
SHELL OIL COMPANY et al., Defendants-Appellees.
 No. 75-4019.
 United States Court of Appeals,
Fifth Circuit.
 May 25, 1979.
 
 Wm. P. Rutledge, Lafayette, La., for Olsen, et al.
 Joel L. Borrello, New Orleans, La., for Argonaut Ins. Co.
 Donald A. Hoffman, New Orleans, La., for Pacific Employers Ins. Co.
 John O. Charrier, Jr., New Orleans, La., for Shell Oil Co.
 W. K. Christovich, Charles W. Schmidt, III, New Orleans, La., for Teledyne Movible.
 Francis G. Weller, New Orleans, La., for Wiegand Co. & Thermo-Disc, Inc.
 Patrick T. Caffery, W. Eugene Davis, New Iberia, La., for Texsteam Corp.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GOLDBERG and FAY, Circuit Judges, and DUMBAULD*, District Judge.
 FAY, Circuit Judge:
 
 
 1
 This controversy involves the explosion of an electric water heater situated in the living quarters of a drilling platform owned by Shell Oil Company (Shell). The drilling was being conducted from the platform by Movible Offshore Inc. (Movible) which had entered into a standard drilling contract with Shell. The insurance company for Movible until November, 1969 was Pacific Employers Insurance Company (Pacific), an affiliate of the Insurance Company of North America (INA). The policy of insurance issued by Pacific to Movible contained the following language with respect to safety inspections:
 
 
 2
 The Company and any rating authority having jurisdiction by law shall each be permitted but not obligated to inspect at any reasonable time the work places, operations, machinery and equipment covered by this policy. Neither the right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the insured or others, to determine or warrant that such work places, operations, machinery or equipment are safe.
 
 
 3
 Under Movible's own inspection program daily inspections took place directed by the Movible toolpusher and weekly visitations to the rigs were made by Movible's Drilling Superintendent and his assistant. There were also daily safety meetings before each crew went to work and there were weekly safety meetings in which all men in the movable rig in the platform participated. Throughout the policy period with Pacific, Movible continued to perform safety inspections. INA also conducted periodic safety inspections of the rigs. On January 22-23 INA's inspector, Gilbert J. Stansbury, inspected the hot water heaters in the pantry and in the galley of the living quarters on the rig. Stansbury made recommendations in writing to Carroll Desormeaux, the Movible toolpusher who accompanied him in the inspection. One of Stansbury's recommendations was that the fusible plug relief valves be changed to temperature pressure relief valves. Prior insurers had also made the same recommendation to Movible with respect to these valves. Instead of ordering pressure-temperature relief valves, however, Movible ordered and installed pressure relief valves. Toolpusher Carroll Desormeaux neglected to tell Movible's purchasing agent that the valves were to be placed on hot water heaters. On January 29, 1969, Movible placed an order with the area Texsteam distributor, Pneumatic Service and Equipment, Inc. for two 3/4 inch, 5550 Texsteam relief valves set at 125 pounds. The valves were replaced on February 3, 1969 and on October 7, 1969 Stansbury returned to the rig and interviewed Desormeaux's replacement, Wyman Haas. In his deposition Stansbury stated that if Haas had verbally assured him that the proper valves had been installed, he would have taken Haas' word for it.
 
 
 4
 On November 1, 1969, INA lost the Teledyne account (which included Movible Offshore Inc.) to Argonaut which provided Movible's insurance at the time of the explosion on May 6, 1970. Argonaut intervened in all of these consolidated cases; it also filed a separate suit against the various defendants to recover the money paid on behalf of the injured parties.
 
 
 5
 In our previous opinion we held that Shell was not liable for breach of certain federal regulations issued by the Secretary of the Interior pursuant to the authority granted to the Secretary by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1334 because the Act did not specifically provide a civil remedy for violations of the statute or regulations and because we felt this was not the type of situation in which a cause of action should be implied or created.[1] We also concluded that in view of the fact that there was no clear precedent it was impossible to rule on the issue of Shell's liability under Louisiana Civil Code Art. 2322. Therefore, we certified the question to the Louisiana Supreme Court which held that Shell was strictly liable under Article 2322. Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1977).
 
 
 6
 As far as the remaining issues we find that 1) the trial court was correct in granting indemnity to Shell; 2) the holding that Movible was negligent and that this negligence was the proximate cause of plaintiffs' injuries was not clearly erroneous; 3) the holding that the Texsteam valve was not defective was not clearly erroneous; 4) there was sufficient evidence from which the trial judge could have determined that the INA inspector was not negligent; 5) in view of the decision by the Louisiana Supreme Court, the trial court's conclusion that to allow Argonaut to maintain its suit would serve no purpose was incorrect.[2]I. Indemnity to Shell Oil Corporation
 
 
 7
 The trial court found that under an agreement between Shell and Movible the latter was obligated to indemnify Shell for negligence on its part causing liability to Shell.
 
 
 8
 A contract to indemnify and hold harmless, if applicable, includes payment of costs and attorney's fees incurred by the indemnitee (Shell). See Loffland Bros. Co. v. Roberts, 386 F.2d 540, 550-551 (5th Cir. 1967). Movible (the indemnitor) argues, however, that no one can obtain indemnity from an employer for injuries or losses sustained by its employees because workmen's compensation is intended to be the exclusive liability of the employer. It is true that Movible's exclusive liability to its employees is under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905. Although Movible is not liable to plaintiffs for negligence because Section 5 of the Act destroys any underlying tort liability on the part of the employer, Robin v. Sun Oil Co., 548 F.2d 554, 556 (5th Cir. 1977), Shell is not barred from recovering under the indemnity contract executed by both parties.
 
 
 9
 In Ocean Drilling & Exp. Co. v. Berry Bros. Oilfield Service, 377 F.2d 511 (5th Cir.), cert. denied, 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967), this Court held that the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905 makes workmen's compensation benefits the exclusive liability of an employer to its employees or to anyone claiming under or through such employee. 377 F.2d at 514 Quoting Ryan Stevedoring Co. v. Pan-Atlantic SS Corp., 350 U.S. 124, 129, 76 S.Ct. 232, 235, 100 L.Ed. 133 (1956).[3] This Court in Berry Bros. refused to extend the Ryan doctrine to the facts of that case where the injuries were sustained on a stationary offshore platform rather than a vessel.[4] Similarly, in the case before us the injuries occurred on a stationary offshore platform. This Court held in Berry Bros. that ODECO was not entitled to recovery under the warranty of workmanlike performance expounded by the Ryan case nor under maritime tort principles. 377 F.2d at 513. However, Berry Bros. specifically left open the possibility of a party contracting to indemnify another party:[5]
 
 
 10
 Thus, while the employer may continue, even in spite of the exclusive liability provision of the Act, to remain liable for indemnity on the basis of an express or implied contractual obligation, in the absence of such obligation, as here, there simply exists no underlying tort liability upon which to base a claim for indemnity against the employer.
 
 
 11
 377 F.2d at 514-515. See Cole v. Chevron Chemical Co. Oronite Division, 477 F.2d 361, 367-368 (5th Cir. 1973).
 
 
 12
 No underlying public policy, no statute and no case law prevents two parties such as Shell and Movible from entering into a contract to indemnify the owner of the platform (Shell) for its liability arising from injuries sustained due to the negligence of the contractor-employer (Movible). The trial court was correct in finding that the contract required Movible to indemnify Shell for attorney's fees and costs. Since the trial court found no liability on Shell's part, it was not necessary for it to go any further on the issue of indemnity. The extent of indemnity for the damages which Shell must now assume by being strictly liable will need to be reconsidered by the trial court. Our holding on this issue is restricted solely to the finding that the intention of the parties is clear on the face of the document and that Shell is entitled to indemnity for the damages caused as a result of Movible's negligence.
 
 II. Negligence of Movible
 
 13
 It is our duty to interpret contracts strictly and to accord the words of a contract their literal meaning. 548 F.2d at 557. The unambiguous terms of the indemnity contract provide that Shell is entitled to be made whole for any liability incurred through Movible's negligence. Consequently, if there had been no negligence on the part of Movible, Shell would not be entitled to indemnity. The trial court found that Movible's negligence was the proximate cause of the injuries to plaintiffs. The trial court stated:
 
 
 14
 The fact that the temperature pressure relief valve, recommended by INA's safety inspector, was not placed on the hot water heater, was due solely to the negligence of Movible's employees. . . . Movible makes no claim that it disagreed with INA's recommendations and reasonably felt that a pressure relief valve was sufficient for the task. Instead, through its own carelessness, it simply failed to obtain the very type of valve which it intended to purchase.
 
 
 15
 Further, the fact that an improper valve was in use on the heater was a proximate cause of the explosion.
 
 
 16
 R. Vol. III at 925.
 
 
 17
 The record reveals that there was sufficient expert testimony from which the trial court could have concluded that Movible was negligent. The expert testimony indicated that had the temperature pressure relief valve been in place, the explosion probably would not have occurred.[6]
 
 
 18
 Fed.R.Civ.P. 52(a) provides that findings of fact will not be disturbed unless they are clearly erroneous and due regard will be given to the opportunity of the trial judge to observe and determine the witnesses' credibility. Finding sufficient basis in the record for the trial court's determination, we must uphold that determination.
 
 III. Liability of Texsteam
 
 19
 Movible argues that it is entitled to indemnity from Texsteam under the theory of implied warranty of fitness, Weber v. Fidelity & Casualty Co., 259 La. 599, 250 So.2d 754 (1971) and under general tort theory, Appalachian Corp. v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1952). With respect to the defectiveness of the Texsteam valve the district court stated:
 
 
 20
 The evidence in this case certainly preponderates that this explosion could not have occurred had the Texsteam 5550 pressure relief valve properly relieved the pressure in the heater tank at 125 lbs. There is, however, no direct evidence that the valve was defective, and the Court is convinced that the circumstantial evidence in the case leaves open the reasonable possibility that the valve may not have relieved the pressure for reasons other than a defect in the valve itself.
 
 
 21
 R. Vol. III at 825.
 
 
 22
 There is sufficient evidence in the record by the experts from which the trial court could have concluded that the pressure relief system may have been blocked causing an explosion. Although circumstantial evidence may be used by the plaintiffs to prove negligence, Louisiana law requires that the plaintiff prove his case by a fair preponderance of the evidence such evidence being of a nature which excludes, with a reasonable amount of certainty, all other reasonable hypotheses. Hargis v. Travelers Indemnity Co., 248 So.2d 613, 615 (La.App. 3rd Cir. 1971). The expert testimony indicated that there were several ways a blockage could have been formed resulting in an explosion. If there was such a blockage of the pressure relief system, the explosion could have been the result of the blockage rather than a defect in the pressure valve. Thus, the findings of the trial court are supported by the evidence and are not clearly erroneous.
 
 
 23
 IV. Negligence of Pacific Employees Insurance Corporation
 
 
 24
 The trial court found that INA had undertaken to inspect Movible's rigs on a periodic basis and to transmit its recommendations to Movible regarding the correction of any unsafe equipment or practice which it found.
 
 
 25
 This Court has stated that an insurer may, by the manner of conduct of safety inspections, or its representations concerning safety inspections create a serious risk to others if the employer relies on the insurer. Stacy v. Aetna Casualty and Surety Co., 484 F.2d 289, 295 (5th Cir. 1973). In Stacy we said that an insurer may be liable if the employer so relied on the insurer's inspections that it neglected its own safety inspection program to its detriment. Id. We held in Stacy, however, that:
 
 
 26
 (R)eliance will not be assumed merely from the existence of a permissive inspection clause in an insurance policy. The insurer's liability must rest upon proof of actual reliance by the insured on the contractual undertaking or on the subsequent representations by the insurer which resulted in acts or omissions by the insured.
 
 
 27
 484 F.2d at 295 (citations omitted).
 
 
 28
 We need not determine whether the trial judge properly concluded that a cause of action for negligent inspection exists under Louisiana law.[7] Whether or not INA originally had the duty to inspect, it is clear that INA was under no duty to reinspect the premises especially if it was assured by a Movible employee, supposedly trained under an extensive safety program, that the recommendations had been carried out.
 
 
 29
 The trial court was correct in reversing itself in its amended judgment and finding that INA was under no duty to visually reinspect Movible's rigs for compliance with INA's recommendations.
 
 V. Liability of Therm-O-Disc and Wiegand
 
 30
 We agree with the trial court that there was not sufficient proof to connect either the Therm-O-Disc control nor the Wiegand flange or heating element with the explosion. There is no evidence to support a finding that either Therm-O-Disc or Wiegand were responsible for or contributed to the explosion.
 
 VI. Argonaut Insurance Company Intervention
 
 31
 The trial court originally decided that Argonaut Insurance Company's independent suit against the defendants to recover compensation payments made to parties other than plaintiffs in this case should be dismissed because those payments were not made pursuant to a formal award. However, in an amended judgment the trial court recognized that subsequent to its decision this Court in Louviere v. Shell Oil Co., 509 F.2d 278 (5th Cir. 1975), Cert. denied, 423 U.S. 1078, 96 S.Ct. 867, 47 L.Ed.2d 90 (1976), held that entry of a formal award is not a condition to the carrier's right to maintain a suit. Although admitting that Louviere would govern the disposition of Argonaut's suit, the trial court held that because there was no defendant from which Argonaut could recover the suit would have to be dismissed.[8] Due to the liability of Shell Oil, this finding by the trial court must be reversed and remanded so that the trial judge can rule according to Louviere.
 
 Conclusion
 
 32
 For the above stated reasons the findings of the district court are affirmed in part, reversed in part and the case is remanded for disposition in accordance with this opinion.
 
 
 33
 AFFIRMED In Part; REVERSED In Part and REMANDED.
 
 APPENDIX
 
 34
 The following are excerpts of expert testimony regarding the explosion:
 
 
 35
 Q And if it had a discharge line from the valve on it, the only water, hot water, that could get in that line is just the water relieved?
 
 
 36
 A The valve opening, that's correct.
 
 
 37
 Q Would that not indicate to you, Mr. Flettrich, that there probably was nothing wrong with that valve, at least, one time while it actually was put into operation?
 
 
 38
 A That is certainly a possibility.
 
 
 39
 Q Did you see anything about the appearance of that valve that indicated any kind of defect or problem in the valve itself?
 
 
 40
 A No, sir. Of course, it was damaged, and damaged in the accident.
 
 
 41
 Q Mr. Flettrich, I show you a valve which has been assumed to have been on the failed heater, and I ask you to examine the top of the seat of the valve?
 
 
 42
 A Somebody wedged it, and I opened it myself. You've got a strong
 
 
 43
 Q Mr. Flettrich, the part of the valve we are looking at now is above the point where the seat opened, and the valve relieved, is that correct?
 
 
 44
 A That's correct.
 
 
 45
 Q And if we could get the jammed part open, that would be the section or the part that would
 
 
 46
 A Well, the seat is actually between the threaded section and the knurled section. I've examined it before.
 
 
 47
 Q Can you see what appears to be a scale buildup on top of that seat?
 
 
 48
 A Yes, there is some indication of a scale there.
 
 
 49
 Q Is there anyway that scale could get there, Mr. Flettrich, other than the valve opening and letting water in this part of the valve so as to form a scale?
 
 
 50
 A That is on the top or discharge side, so it would have to get water up there in order to do that.
 
 
 51
 Q That would indicate also, would it not, sir, that the valve had relieved while in operation?
 
 
 52
 A At sometime, yes.
 
 
 53
 Q And would you expect to get this much scale on just a single relief? Would that not indicate relief fairly continuously and over some
 
 
 54
 A Over some period of time, that's correct.
 
 
 55
 Q It would indicate opening of the valve over a fairly extended period of time, would it not?
 
 
 56
 A That is correct.
 
 
 57
 Q Mr. Flettrich, you indicated in answer to Mr. Weller's question that water hammer as a possibility of explanation for this accident was somewhat remote. Wouldn't you say that the occurrence of this accident itself is very remote?
 
 
 58
 A Well, water heater explosions are happening all over the country all of the time, and we have been fortunate in this area not to have them in that degree. They are rather remote.
 
 
 59
 Q Mr. Flettrich, aren't there a number of explanations for failure of a relief system other than defect in the valve itself?A Certainly.
 
 
 60
 Q And one example of that is blockage of the piping?
 
 
 61
 A Yes.
 
 
 62
 Q Can you give the Court any other example of failure of a relief system other than the defect in the valve itself?
 
 
 63
 A Right off I can't think of any unless you take in the operator's practice of, if a relief valve pops off, often they tie the handle down. There is no indication that was the case here, in other words, the human element that gets involved in all of this.
 
 
 64
 Q For example, if one put a cup, for example, over the handle of that valve, that would impinge the handle, and the valve could not open, is that correct?
 
 
 65
 A That is correct.
 
 
 66
 Q You design heating systems as part of your business?
 
 
 67
 A Yes.
 
 
 68
 Q In connection with designing a heater system, is it necessary for you to be familiar with the Louisiana Plumbing Code?
 
 
 69
 A Yes. All the plumbing codes had very little to say about hot water installation, but that is true.
 
 
 70
 Q Are you familiar with the provisions in the Louisiana Plumbing Code which provides, in effect, that it is necessary to have either a temperature pressure relief valve on the hot water heater, or a separate temperature valve and separate pressure valve?
 
 
 71
 A Yes.
 
 
 72
 Q That is contained in the Louisiana Plumbing Code, is it not?
 
 
 73
 A Yes.
 
 
 74
 Q How long, if you know, has that provision been a part of the Louisiana Plumbing Code?
 
 
 75
 A I have no idea how long it has been there. It is accepted practice that a water heater should have temperature, pressure protection.
 
 MR. CHRISTOVICH:
 
 76
 We object because there is no showing that Louisiana Plumbing Code is applicable to this particular installation, this particular locale. I would think that counsel will have a right to cross on that point, but I merely make that objection.
 
 THE COURT:
 
 77
 Your objection is noted.
 
 BY MR. DAVIS:
 
 78
 Q How long were you aware of the fact that the Louisiana Plumbing Code has this provision in it?
 
 
 79
 A Oh, perhaps 20 years, maybe. I don't really know, but it was in the code, I know the practice, let me put it that way, and there is a lot of things that engineers do, and, I might add, that I do things quite often in the interest of safety that are not in the code.
 
 
 80
 I don't really know the answer to your question, but I can tell you we have been aware of this for over 20 years.
 
 
 81
 Q Mr. Flettrich, I show you a copy of the plumbing code entitled "Sanitary Code, State of Louisiana, Chapter 10-A, Plumbing," and I will ask you to refer to Section 13 excuse me, page, and Paragraph 8.13.2.
 
 MR. CHRISTOVICH:
 
 82
 Can I see that just a minute?
 
 MR. DAVIS:
 
 83
 It is attached to my pretrial order.
 
 BY MR. DAVIS:
 
 84
 Q Would you read that paragraph to the Court?
 
 
 85
 A Certainly.
 
 
 86
 "8.13.2: Temperature relief valves. Temperature relief valves shall be installed for all equipment used for heating or storage of hot water. Each valve shall be rated as to its B.T.U. capacity at 210 degrees Fahrenheit. It shall be capable of discharging sufficient hot water to prevent any further rise in temperature."
 
 
 87
 Q Do you know if there is any prohibition in the code against reducing the outlet size of the relief valve.
 
 
 88
 A I am not sure if it is in there, but it is in codes. It is not accepted practice to reduce the outlet.
 
 
 89
 Q You wouldn't be surprised if it was in the code?
 
 
 90
 A I wouldn't be a bit surprised.
 
 
 91
 Q You would never permit your men to reduce the size of the discharge outline on it?
 
 
 92
 A We have chastized a few.
 
 
 93
 Q Isn't it correct, sir, that if a discharge line is reduced, and reduced or restricted, that this can severely impair the discharge capability of a valve?
 
 
 94
 A Yes, sir.
 
 
 95
 Q In other words, you could get a situation where the discharge line is so reduced that the valve cannot discharge whatever it is relieving fast enough to prevent a buildup?
 
 
 96
 A It has two effects: One is the fact, that is, the restriction of flow, and the other is that the increase on the discharge pressure, the relief valve operates on pressure differentials, and if you increase the pressure on the discharge line, you increase the pressure at which it discharges on the inlet side.
 
 
 97
 Q Under your theory of this accident, Mr. Flettrich, what temperature do you think the water reached just before the accident?
 
 
 98
 A I have no idea except that it had to be over 212, if the tank took off.
 
 
 99
 Q If the water was say 225 degrees, under 30 pounds of pressure in the tank, and this relief valve relieved, that is, the valve would be relieving, and when the valve opened, it would be water on the outside?
 
 
 100
 A It would steam. It would flash, that's correct.
 
 
 101
 Q And steam has a considerably greater volume than water?
 
 
 102
 A Very, very much so.
 
 
 103
 Q Wouldn't this make the restriction of the outlet line a much more serious problem where your relieving water then flashes into steam?
 
 
 104
 A Yes, it would . . .
 
 BY MR. DAVIS:
 
 105
 Q Mr. Flettrich, if you were selling valves for hot water heaters and someone came to you and asked you for a valve to go on a hot water heater, what type of valve would you give the customer?
 
 MR. CHRISTOVICH:
 
 106
 Objection. The gentleman isn't a salesman; he is an engineer.
 
 THE COURT:
 
 107
 That is why he said "if."
 
 
 108
 The objection is overruled. You may answer.
 
 THE WITNESS:
 
 109
 Of course, I would give him a temperature pressure, designed for a hot water heater.
 
 MR. DAVIS:
 
 110
 Thank you very much.
 
 
 111
 Q Is it a fact, sir, that it is your opinion and it has been your opinion, and is today, that this explosion could not have occurred without the failure, for whatever cause, of the pressure relief valve?
 
 
 112
 A That is correct.
 
 
 113
 Q Is it also a fact that you have narrowed that failure down pretty much to a question of either it failed by virtue of some defect within the valve, or because there was some blockage of the system, therefore restricting the valve from operating?
 
 
 114
 A I suppose that would be so, sticking valve, or blockage.
 
 
 115
 Q Suppose that you had a failure simply by what you call a water hammer, with just normally heated water, that is, not superheated water, or take just cold water, and you had a failure by water hammer, then what type of failure would you have? And will you describe it.
 
 
 116
 A I'm not sure what type of failure we would have, since water hammer is something that I haven't seen, frankly, ever. I haven't seen any destruction I have read reports, and so forth. So I'm really not qualified to answer that question. I think that water hammer just to do that much damage is a rare happening.
 
 
 117
 Q Now, suppose that there was not superheated water in this tank, and you only had a hydrostatic pressure to cause the tank to fail; do you think you would have gotten this type of explosion?
 
 
 118
 A You would have had no explosion whatsoever. There is no stored energy in water at normal temperatures, and the tank would just simply leak, and that is all. Water would not have flashed into steam at normal temperatures, below 212.
 
 
 119
 Q In other words it was a superheated water that in effect, caused the general catastrophe, is that correct?
 
 
 120
 A Superheated water, I think, is the cause of the destruction
 
 
 121
 Q Yes.
 
 
 122
 A and I think the initial failure was the tank rupture.
 
 
 123
 Q Yes.
 
 
 124
 A But you have to have the two in order to get the end result.
 
 
 125
 Q And, among other things, the pop-off valve or relief valve, that was put on there to relieve pressure from superheated water, is that not correct?
 
 
 126
 A To relieve pressure from normal thermal expansion, superheated or through a normal range.
 
 
 127
 We've used the term "superheated," here, and it is not a technically correct term. I think we're talking about water over 212, so you don't superheat the water you superheat the steam.
 
 MR. RUTLEDGE:
 
 128
 Thank you.
 
 
 129
 I believe that is all.
 
 
 130
 Q Let me ask you about a pressure temperature valve.
 
 
 131
 What else do you get when you put on a pressure temperature valve that you don't get when you have just a pressure valve?
 
 
 132
 A You've got a safeguard against elevated temperatures. Those are set at 210 degrees to relieve whenever the water temperature gets over 210.
 
 
 133
 Q I went and looked in my shed this morning and it says 210 degrees or 120 p.s.i., and is that what you mean?
 
 
 134
 A That is about what you get, or what it provides.
 
 
 135
 Q Is that a heat rating or a B.T.U. rating?
 
 
 136
 A Yes.
 
 
 137
 Q What is that?
 
 
 138
 A The B.T.U. rating is, the valve is rated two ways: One on the pressure, steam basis, which is ASME, and the other is the water rating, which is for the temperature relief device; and, the idea being that they want the temperature relief device to relieve fast enough to keep the temperature from rising in the tank.
 
 
 139
 Q If we had had a pressure temperature valve on this heater, am I correct that what you are saying is that the temperature got to a certain point, and if it was at 210 it would have relieved at 210?
 
 
 140
 A That is correct.
 
 
 141
 Q And what would that have done insofar as preventing this explosion?
 
 
 142
 A Cold water comes in, and we immediately start the water temperature to falling.
 
 
 143
 Q It lets cold water in.
 
 
 144
 In your opinion, would that have prevented this casualty from occurring if they'd had it?
 
 
 145
 A If enough cold water would have come in to the heater at that temperature within the tank, and, of course, if the valve was relieving, the tank wouldn't have ruptured.
 
 
 146
 Q Regardless of what kind of valve you had on there, if it had relieved at the rated pressureA You would have not ruptured the tank.
 
 
 147
 Q So if you had had a temperature pressure relief valve on there, you would have had an additional safeguard, is that correct?
 
 
 148
 A A safeguard, and if it had been working properly, then the water temperature would not have gone above 212.
 
 
 149
 Q And you couldn't have gotten to the pressure that you were talking about?
 
 
 150
 A Well, as long as it was relieving.
 
 
 151
 Q And with only the pressure valve that we have, the valve that was on the system, that type of valve, is it not possible that you could have gotten a situation where the scale could have completely plugged up either the inlet to the valve or the outlet to the valve?
 
 
 152
 A Certainly.
 
 
 153
 Q And prevented this thing from operating?
 
 
 154
 A Certainly.
 
 
 155
 Q Is it also possible that you could have gotten scaling entirely in the valve, so as to prevent the seat from working?
 
 
 156
 A Certainly.
 
 
 157
 Q So, scaling is one thing that could have caused it?
 
 
 158
 A Yes.
 
 
 159
 Q And if you had a temperature valve would scaling have made any difference?
 
 
 160
 A Well, depending on the construction of the valve. If the scale would affect the pressure side of a temperature pressure relief valve, it would certainly affect the pressure and temperature equally.
 
 
 161
 Those valves are constructed differently; the guides with this lower guide are more effective than one with the guide above.
 
 
 162
 Q The type of valve that you have here is such a thing as a bottom guide?
 
 
 163
 A Yes.
 
 
 164
 Q When do you use a bottom guided valve? And when don't you use a bottom guided valve?
 
 
 165
 A Well, generally, bottom guided valves are not used for water service.
 
 
 166
 Q And this is a bottom guided valve?
 
 
 167
 A Yes.
 
 
 168
 Q You said that a bottom guided valve is not used for water service?
 
 
 169
 A For water service.
 
 
 170
 Q And this is a bottom guided valve?
 
 
 171
 A Yes, sir.
 
 
 172
 Q Was this valve this valve was supposedly for water service? Or what service?
 
 
 173
 A I have no idea. I have no information on it.
 
 
 174
 Q Well, the way the valve was situated on the hot water heater, if the valve relieved, would it be relieving water or steam or air, or what?
 
 
 175
 A It depends on the situation. As long as the water in the tank was still in the liquid state, which is usually the case, it would initially relieve as water.
 
 
 176
 And if it was superheated, say above 212, it would relieve steam the minute it hit atmospheric conditions.
 
 
 177
 Q What I'm trying to find out is, if that is a bottom guided valve, why don't you use a bottom guided valve?
 
 
 178
 A Merely to prevent against sticking on the guide due to scaling.
 
 
 179
 Q Due to scaling? And this is a bottom guided valve, so am I correct that you don't think, or am I correct that this is not the right valve for that application?
 
 
 180
 A Well, the ASME code says that bottom guided valves should not be used for water service.
 
 
 181
 Q Just by looking at the valve externally, could you tell whether it was one or the other?
 
 
 182
 A Well, I can tell by looking in it, not mounted on the tank. You mean on the tank?
 
 
 183
 Q Yes?
 
 
 184
 A No, sir.
 
 
 185
 Q You would have to take out the valve?
 
 
 186
 A I would look it up in the literature and tell.
 
 
 187
 Q You would look at a picture, but not externally while
 
 
 188
 A Right.
 
 
 189
 Q In view of the conditions which you have heard existed here, the operating conditions, would a pressure temperature valve have been preferable to the valve that we have there?
 
 
 190
 A From all good practice, yes. In my opinion it would have been much better, yes.
 
 
 191
 Q It would have worked regardless of scale?
 
 
 192
 A Oh, no. They can scale also.
 
 Q So scale could have caused it to
 
 193
 A It could; yes. But a valve built for water would not be as subject to binding as one not built for water.
 
 
 194
 Q So that is a question of degree?
 
 
 195
 A Yes.
 
 
 196
 Q So is it a fair statement that regardless of what kind of valve we put on there, it is subject to scaling in the operation?
 
 
 197
 A Pressure temperature valves have test levers also for that very purpose, to keep them free.
 
 
 198
 Q Now, the test lever, is this something based on your experience in the industry? We've got a hot water let's say that we've got a hot water heater setting out here in the living quarters, in the living module, galley, or pantry that you had on there at the platform, and is there some maintenance program? What would you do for maintenance on this heater?
 
 
 199
 Is there something that everyday you should go look at it? Every week? Every month? Or is it every six months, or every year?
 
 
 200
 A A thing like this, there should be a schedule set up, about once a month.
 
 
 
 *
 District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 See Olsen et al. v. Shell Oil Company, 561 F.2d 1178, 1181-1190 (5th Cir. 1977)
 
 
 [2]
 The trial court stated:
 Subsequent to this Court's decision, the United States Court of Appeals for the Fifth Circuit held that entry of a formal award is not a condition of the carrier's right to maintain suit. Louviere v. Shell Oil Co., 509 F.2d 278 (5th Cir. 1975). That decision, of course, would govern the disposition of Argonaut's independent suit. However, in light of our present disposition of these consolidated cases, there is no defendant from whom Argonaut can recover its compensation payments, and its suit must, on that ground, be dismissed.
 R. Vol. III at 926.
 
 
 [3]
 The Ryan case permitted a vessel to recover damages for which it was liable to an injured worker where it could be shown that the stevedore breached an express or implied warranty of workmanlike performance. Since the legislature changed the liability from an absolute liability on the part of the vessel to a liability based on negligence the legislature felt it was no longer necessary to permit the vessel to collect against the employer or the stevedore. See Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, H.R.Rep. No. 1441, 92d Cong., 2nd Sess., Reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 4698, 4704
 
 
 [4]
 In the Berry Bros. case, Ocean Drilling and Exploration Co. (ODECO) sought indemnity from Berry Bros. Oilfield Service (Berry Bros.) for injuries sustained by employees of Berry Bros. in the course of performing repairs on a stationary offshore platform owned by ODECO
 
 
 [5]
 The indemnity agreement between Shell and Movible reads as follows:
 In the performance of the operations hereunder, contractor is an independent contractor, Shell, being interested only in the results obtained. Contractor agrees to protect, indemnify and save Shell, and where the operations are rendered in a joint operation, such other parties in the joint operation with Shell, harmless from and against all claims, demands and causes of action of every kind and character, arising in favor of third parties on account of personal injuries and/or deaths or damages to property occurring, in anywise incident to, in connection with, or arising out of, contractor's negligence in performing the operations under this contract.
 
 
 [6]
 See Appendix A, Infra
 
 
 [7]
 The trial judge concluded that "although Louisiana law is not settled on the issue of whether its tort law permits a Workmen's Compensation Carrier to be sued for negligent inspection" the better view would be that an action for negligent inspection is proper when not prohibited by the compensation statute involved. R. Vol. III at 919
 
 
 [8]
 See n. 21, Supra