**PUBLIC SERVICE COMPANY OF COLORADO, a Colorado corporation, Plaintiff–Appellant and Cross–Appellee,**

v.

**UNITED CABLE TELEVISION OF JEFFCO, INC., a Colorado corporation, Defendant–Appellee and Cross–Appellant.**

No. 89CA1254.

Colorado Court of Appeals,
Div. II.

Feb. 14, 1991.

As Modified on Denial of Rehearing
March 28, 1991.

Cross Petition for Certiorari
Granted Sept. 3, 1991.

Petition for Writ of Certiorari
Denied Sept. 3, 1991.

---

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Brent L. Backes, Denver, James R. McCotter, Sr. Vice–President and General Counsel, Denver, for plaintiff-appellant and cross-appellee.

Greengard Senter Goldfarb & Rice, William L. Senter, Floyd M. Youngblood, Denver, for defendant-appellee and cross-appellant.

Opinion by Judge DUBOFSKY.

In this action for indemnification, plaintiff, Public Service Co. (PSC), appeals the trial court's dismissal of its indemnity claim against defendants, United Cable Television of Jeffco, Inc. (United) and Community TCI of Colorado, Inc. (TCI) (collectively licensees). Licensees cross-appeal the trial court's determination that the Workers' Compensation Act (Act), particularly the provision now codified as § 8–42–102, C.R.S. (1990 Cum.Supp.), does not preclude this indemnification action. We affirm in part and reverse in part.

PSC entered into a pole license agreement with TCI in 1982, which was later assigned to United, permitting licensees to place their television cables on PSC's utility poles. The agreement contained an indemnity provision which states:

"Licensee shall indemnify and save and hold harmless Electric Company [PSC] and third parties using electric company poles *from and against all claims*, liabilities, causes of action, or other legal proceedings by third parties for damage to property, violation of occupancy agreements or conditions, or *injury or death of any person or persons in any way arising out of, connected with or resulting from the exercise by licensee of the rights granted to it hereunder*, the existence or operation of Licensee's facilities and any other use of Electric Company's poles or facilities by Licensee, its employees, agents or contractors, including, but not limited to, any claims by Licensee's subscribers for lack of or interruption of service. Indemnity shall include *Licensee's obligation to defend any and all such actions, claims* or other legal proceedings and to reimburse Electric Company and third parties using Electric Company poles for all expenses, including attorney fees, incurred in connection therewith." (emphasis added)

In 1984, United hired Montgomery Line Construction Company (Montgomery) to remove television cables attached to PSC poles. Montgomery's employee, Lawrence Rose, was injured when he cut a cable and the pole on which he was standing broke and fell to the ground. He subsequently sued PSC claiming that the pole had not been properly maintained. Although PSC had a nondelegable duty of care with regard to its utility poles, it had entered into a contract with Osmose Wood Preserving, Inc. (Osmose) for Osmose to maintain and inspect its poles. PSC claimed at trial that Rose's injuries were not caused by its failure properly to inspect or maintain the pole, but were the direct result of Rose's

unsafe practices when removing the television cables.

The jury returned a verdict for Rose, attributing 15 percent negligence to him and 85 percent negligence to PSC. Six days after the jury verdict, PSC sought to be indemnified by United under the above-quoted provision for the amount of the judgment plus attorney fees. PSC later settled with Rose for a lesser amount and paid the claim.

At the trial for indemnification, the court concluded that PSC was bound by the jury's finding of negligence in the *Rose* litigation and further ruled that PSC could not recover for its own negligence under the indemnity provision. The court also concluded that PSC would be entitled to indemnification by United for Rose's negligence, but that PSC had waived its right to do so by intentionally failing to notify United of the pending *Rose* litigation. Furthermore, the court found that an action for indemnification by PSC was not precluded by § 8–42–102 of the Act.

### I.

We initially address United's cross-appeal, in which it claims the trial court erred in determining that the Workers' Compensation Act, § 8–40–101, et seq., C.R.S. (1990 Cum.Supp.), does not preclude PSC from seeking indemnification from United. We perceive no error in the court's ruling.

United is a statutory employer under the statute now codified as § 8–48–101, C.R.S. (1990 Cum.Supp.). The Act specifically precludes a tortfeasor from maintaining a third-party action for indemnity against a statutory employer. Here, however, PSC and United entered into an express contractual agreement for indemnification. Thus, the question becomes whether such a contract remains valid in light of the statutory provision.

■ The Act was passed to provide a speedy and just method of compensating employees for job related injuries without regard to the fault of either the employee or the employer. Section 8–40–102, C.R.S. (1990 Cum.Supp.); *Frohlick Crane Ser-*

*vice, Inc. v. Mack,* 182 Colo. 34, 510 P.2d 891 (1973). Employers who participate in the Workers' Compensation Program gain immunity from lawsuits by injured employees and, in most instances, from third-parties who are liable to the employee but also claim a right of indemnity against the employer. *Hilzer v. MacDonald,* 169 Colo. 230, 454 P.2d 928 (1969).

■ Further, the immunity of employers under the Act extends to actions based on common law indemnity claims. *Public Service Co. v. District Court,* 638 P.2d 772 (Colo.1981). A common law indemnity claim is one without an express contractual provision and typically is based on concepts of active/passive negligence. *Vickery v. Reliable Electric Co.,* 703 F.2d 488 (10th Cir.1983). However, the employer immunity provisions of §§ 8–42–101 and 8–42–102, C.R.S. (1990 Cum.Supp.) have not yet been construed in relationship to an express contractual agreement for indemnity.

■ A majority of jurisdictions have decided an express contractual agreement is valid between a third-party and an employer who would otherwise be immune under a workers' compensation statute. *See Rucker Co. v. M & P Drilling Co.,* 653 P.2d 1239 (Okla.1982); *City of Artesia v. Carter,* 94 N.M. 311, 610 P.2d 198 (1980); *Olsen v. Shell Oil Co.,* 595 F.2d 1099 (5th Cir.1979); *DeShaw v. Johnson,* 155 Mont. 355, 472 P.2d 298 (1970); *Titan Steel Corp. v. Walton,* 365 F.2d 542 (10th Cir.1966); *but see Young v. Mobil Oil Corp.,* 85 Or.App. 64, 735 P.2d 654 (1987); *Paul Krebs & Associates v. Matthews & Fritts Construction Co.,* 356 So.2d 638 (Ala.1978) (allowing contractual indemnity recovery "would be to allow indirectly what is prohibited directly").

2B A. Larson, *Workmen's Compensation Law* § 76.42 (1989) states:

"The clearest exception to the exclusive-liability clause is the third party's right to enforce an express contract in which the employer agrees to indemnify the third party for the very kind of loss that the third party has been made to pay to the employee."

The decisions upholding express indemnity agreements rely, in part, on the employer's freedom of contract rights and his right to waive statutory protections. In *City of Artesia v. Carter, supra,* the court stated:

"Enforcing express contracts of indemnity is no more than enforcing the loss distribution agreed to by the contracting parties.... This arrangement to distribute the loss does not offend any policy concerned with securing the payment of workmen's compensation; the compensation payable is not affected by the indemnity agreement. This arrangement does not depart from the policy of limiting the employer's liability; that policy remains intact. All that is involved is the employer's departure from the policy. *If the employer desires to voluntarily relinquish his statutory protection, he may do so .... [S]uch a relinquishment is consistent with the policy favoring the right to contract.*" (emphasis added)

The language limiting claims against employers under the Colorado Act is similar to the language found in the statutes in other jurisdictions which validate express indemnity agreements between an employer and third-parties. *See DeShaw v. Johnson, supra; Holly Sugar Corp. v. Union Supply Co.,* 194 Colo. 316, 572 P.2d 148 (1977) (Colorado Workers' Compensation Act is "nearly identical to the Montana Act"); *City of Artesia v. Carter, supra.*

We, therefore, agree with the majority rule and conclude that the trial court was correct in determining that the Act did not immunize United from a claim based on an express indemnity agreement.

## II.

In its appeal, PSC argues that the trial court erred in concluding that, under *Williams v. White Mountain Construction, Co.,* 749 P.2d 423 (Colo.1988), the indemnity agreement between PSC and United is ambiguous and unenforceable. Since we also conclude that the agreement is unenforceable on its face, we agree with the conclusion of the trial court.

In *Williams,* a subcontractor dug a trench according to express directions from the contractor's superintendent. The subcontractor advised the superintendent of the hazards of digging the trench in accordance with his instructions and the superintendent replied, "Don't worry about it—we will take care of it if anything happens." Williams, an employee of the contractor, was seriously injured when the trench collapsed. Williams received workers' compensation benefits which precluded a tort action by him against his employer. He did, however, file suit against the subcontractor alleging that his injuries were caused by its negligence.

The subcontractor, relying on the oral statement of the contractor's superintendent, filed a third-party complaint against the contractor for indemnification. The *Williams* court ruled that no indemnification contract had been formed. It did so on the basis that:

"[I]ndemnity contracts holding indemnitees harmless for their own negligent acts must contain clear and unequivocal language to that effect...."

■ Thus, under the reasoning of *Williams,* an indemnity contract must clearly reflect the parties' intent that the contract cover the wrongful or negligent conduct of the indemnitee. Absent a clear statement to this effect, the contract will be construed not to include the negligent conduct of the indemnitee. *See Batson–Cook Co. v. Industrial Steel Erectors,* 257 F.2d 410 (5th Cir.1958). As the *Williams* court emphasized, quoting from *Batson–Cook:*

"[T]his extraordinary liability on the Indemnitor must be spelled out in unmistakable terms. It cannot come from reading into the general words used the fullest meaning which lexicography would permit...."

The principle is also followed in *United States v. Seckinger,* 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). There, the court stated:

"More specifically, we agree ... that a contractual provision should not be construed to permit an indemnitee to recover

for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. This principle, though variously articulated, is accepted with virtual unanimity among American jurisdictions. The traditional reluctance of courts to cast the burden of negligent actions upon those who were not actually at fault is particularly applicable to a situation in which there is a vast disparity in bargaining power and economic resources between the parties...."

The court in *Seckinger* indicates that there is a split in jurisdictions as to whether the term "negligence" must be used in an indemnity contract before it adequately covers the indemnitee's negligent conduct. *Compare Freed v. Great Atlantic & Pacific Tea Co.*, 401 F.2d 266 (6th Cir.1968) *with Batson–Cook Co. v. Industrial Steel Erectors, supra.*

Under *Williams*, however, there is no requirement that the term "negligence" be used in an indemnity contract before the indemnitee can recover for his own negligence. An indemnity contract may be found to cover the indemnitee's negligence if the intention to do so is otherwise clear.

When the parties employ broad language which purports to indemnify against "all claims," the majority rule is that such language is insufficient to require indemnification for the negligent or wrongful conduct of the indemnitee. *United States v. Seckinger, supra; Batson–Cook v. Industrial Steel Erectors, supra; Young v. Anaconda American Brass Co.*, 43 Wis.2d 36, 168 N.W.2d 112 (1969); *Freed v. Great Atlantic & Pacific Tea Co., supra;* Annot., 175 A.L.R. 8 *Limiting Liability for Own Negligence* (1st ed. 1948).

The above-cited cases indicate that since indemnification for the negligence of another party is not favored in the law, there must be a clear and unambiguous assumption of that responsibility in the indemnity contract itself. These cases do not look beyond the written indemnity agreement to determine the intent of the parties.

■ *Williams* adopts the majority view that broad indemnity agreements do not, absent specific written statements to the contrary, include indemnity for negligent acts. In *Williams*, however, the court determined that the critical oral statement was both broad and vague and, therefore, it looked at the parties' stipulation to determine if negligent conduct was covered in the stipulation.

■ Here, after the trial court determined that the wording of the agreement did not require United to indemnify PSC for PSC's negligence, it held a hearing to determine the intent of the parties as to the scope of coverage of the written agreement. Following the hearing, the trial court concluded the parties did not intend, through the agreement or otherwise, to cover PSC's negligent conduct.

The trial court correctly determined initially that the indemnity contract did not cover the negligent conduct of PSC, and once having resolved this issue, it should not have held a hearing to determine further the parties' intent. The primary reason for the majority rule that broadly worded contracts do not cover the negligent acts of the indemnitee is the strong public policy against indemnifying a tortfeasor for his negligent conduct. Thus, before an indemnity contract will be construed to cover negligent conduct, this understanding must be clearly and unambiguously stated in the written agreement. It is not the "ambiguity" of the agreement itself which raises the issue of the scope of coverage.

Although *Williams* in effect adopted the majority rule concerning the interpretation of broadly worded indemnity agreements, since the oral statement underlying the indemnity claim was ambiguous, the court looked to other evidence to discern the parties' intent.

The contract here, however, unlike the one in *Williams*, is not vague and ambiguous, and therefore, the trial court, although correct in its ruling, improperly based its holding on the intent of the parties determined upon an evidentiary hearing, rather than upon the parties' failure to include the

necessary wording in the indemnification agreement.

PSC argues that *Williams* is based on a short oral statement and, thus, that it has little applicability to the detailed written indemnity agreement here. Furthermore, the indemnity agreement at issue indemnifies PSC for all cases arising out of the use of its poles which result in personal injury or death. Therefore, it argues, it is disingenuous to require a more explicit statement to impose indemnity responsibility on United for PSC's negligence.

PSC relies primarily on *Glaspell v. Ohio Edison Co.*, 29 Ohio St.3d 44, 505 N.E.2d 264 (1987). *Glaspell* concerned an indemnity agreement negotiated between owners of telephone poles and a cable company for the use of the poles by the cable company. The language in the indemnity agreement is very similar to the language used here, *e.g.*, "agrees to indemnify and save harmless ... against any loss, cost, charges, damages ... which the licensor ... may at any time ... sustain...." Despite recognizing the general rule of narrowly construing contracts which purport to indemnify for the negligent conduct of an indemnitee, the court in *Glaspell* upheld the indemnification agreement. The court reasoned there was equal bargaining power between the parties and that such a contractual agreement represents a clear and precise way of allocating the risk of doing business between the parties.

While PSC's arguments, as reflected in the *Glaspell* case, are substantial, we, as was the trial court, are persuaded that *Williams* requires a contrary conclusion.

### III.

United also argues that, under the indemnity agreement, it was entitled to receive notice prior to the *Rose* lawsuit and that the failure of PSC to give notice relieves it of any indemnification obligation. The trial court determined that PSC's failure to provide notice to United to defend the lawsuit waived PSC's right to all indemnity under the contract.

PSC argues that its failure to give early pretrial notice of Rose's claim was solely a condition precedent to its right to obtain a defense from United and, thus, a reimbursement for defense costs is the only indemnity right it lost. We agree with PSC.

■ Absent a notice provision in the agreement to the contrary, an indemnitee need not give notice to an indemnitor in the underlying action prior to the entry of judgment. *Duncan v. Schuster–Graham Homes, Inc.*, 194 Colo. 441, 578 P.2d 637 (1978); *McStain Corp. v. Elfline Plumbing & Heating, Inc.*, 38 Colo.App. 473, 558 P.2d 588 (1976).

Here, however, in addition to the agreement requiring United to compensate PSC for damages from personal injuries, the contractual provision implicitly requires notice to United to trigger an obligation to defend against claims. The courts have generally held that such contract provisions are severable and, thus, the failure to give notice to an indemnitor forfeits or waives its defense responsibilities, but does not otherwise affect its obligation to indemnify for damages. *See Transamerica Insurance Group v. Empire Mutual Insurance Co.*, 31 Conn.Supp. 235, 327 A.2d 734 (1974); 14 G. Couch, *Cyclopedia of Insurance Law* § 51.35 (R. Anderson Rev. ed. 1982); A. Windt, *Insurance Claims & Disputes* § 6.09 (2d ed. 1988).

■ We note that this contractual provision does not state that United has the "right" of defense. Generally, the right to defend implies a right of control of the lawsuit and its outcome. *See Travelers Insurance Co. v. Guidry*, 444 So.2d 191 (La.App.1983). If the indemnity agreement included the "right" to defend language, there would be a more substantial claim that PSC's failure to give notice forfeited all rights to indemnity under the contract. Since the obligation to defend is treated separately in the agreement and there is no indication that the clauses are interdependent, we determine that PSC's failure to provide timely notice to United regarding an obligation to defend does not forfeit its other indemnity rights or represent a fail-

ure to meet any other condition precedent under the contract.

The parties agree that the contract permits PSC to be indemnified for the damages it paid for the negligence, if any, 1 of United for which it was found liable.

## IV.

PSC claims it is entitled to a separate trial to determine the percentage negligence attributable to United in the subsequent indemnity action. United argues PSC is bound by the *Rose* jury verdict attributing 85 percent negligence to PSC and that, therefore, PSC is collaterally estopped from determining the negligence of Rose. We determine that PSC is entitled to a separate trial only as to United's negligence which is independent of Rose's.

Since the policy of prohibition which prevents indemnity of a tortfeasor applies only to the negligent conduct of PSC, we determine that PSC is entitled to a separate trial as to the negligence of the parties, other than Rose, whose negligence, independent of Rose's, contributed to Rose's injuries. In other words, the court on remand should determine what percentage of the amount paid to Rose was attributable to PSC's negligence and what percentage was attributable to parties other than PSC and Rose. For these purposes, Rose's negligence cannot be imputed to any party. For example, if those other parties constituted 50 percent of PSC's negligence, then United would be obligated to indemnify PSC for 50 percent of the amount paid by it to Rose.

Although the trial court indicated that PSC could be indemnified by United for Rose's negligence under the agreement, because the damage award was already discounted 15 percent because of Rose's negligence, this decision does not now benefit PSC.

■ Collateral estoppel applies if: (1) the issue in the prior adjudication was identical to the one presented in the current action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party (or in privity with the party) in the prior litigation; and (4) the party against whom the plea is asserted had a full and fair opportunity to litigate the issue previously. *Pomeroy v. Waitkus,* 183 Colo. 344, 517 P.2d 396 (1973).

■ Here, PSC had an ample and fair opportunity to litigate the precise issue of its negligence versus Rose in the *Rose* litigation. Therefore, we agree with the trial court that the doctrine of collateral estoppel prohibits PSC from relitigating its negligence versus Rose and the negligence of Rose, if any, imputed to United because of the statutory employment relationship. However, with regard to the independent comparative negligence of United, if any, we conclude that it was not placed directly in issue in the *Rose* litigation. Additionally, PSC did not have a full and fair opportunity to litigate the issue against United because of the immunity conferred by United's status as a statutory employer under § 8–48–101.

We note that under Restatement (Second) of Judgments § 57 (1982) a non-party indemnitor (such as United) is only bound by the result of a lawsuit in limited circumstances which do not exist here. Therefore, we determine PSC is entitled to a separate trial to determine United's negligence which is independent of Rose's.

The judgment is affirmed in all respects except as to that portion of it concerning the adequacy of notice and the negligence of PSC. Those parts of the trial court's judgment are reversed, and the cause is remanded for further proceedings in order for the trial court to determine what portion of the negligence attributable to PSC in the *Rose* case was the result of its sole negligence, and what percentage is fairly attributable to parties other than PSC and Rose.

SMITH, J., concurs.

STERNBERG, C.J., dissents.

Chief Judge STERNBERG dissenting.

I disagree with Part II of the majority opinion and therefore respectfully dissent from that part of the opinion.

It is important to emphasize the factual background of the case before us. Public Service Company owned utility poles; United Cable's predecessor was allowed to use these poles to string its lines. These two sophisticated corporations engaged in arms-length negotiations which culminated in a written agreement under which Public Service Company authorized the use of its poles. In an obvious effort to prevent Public Service Company from incurring any liability because of that authorization, an indemnity provision was inserted, the object of which was to protect Public Service Company from "all claims." The provision in question, quoted in full in the majority opinion, in my view, unambiguously succeeds in holding Public Service Company harmless from all claims—including those arising from its own alleged negligence.

The language is straightforward; only by straining logic can one find an ambiguity. Two sophisticated business entities negotiated and reduced to writing their agreement. To use questionable semantic ingenuity to create an ambiguity in the language at issue here will serve only to encourage, indeed, to require, lawyers drafting such agreements in the future to pile on more and more "legal gobbledygook," thereby obfuscating further the intentions of the parties.

The majority and the trial court are persuaded that *Williams v. White Mountain Construction Co.*, 749 P.2d 423 (Colo.1988) "requires" their conclusion. In my view, the situation here is far beyond the scope of any precedential mandate arising from *Williams*.

As the majority notes, the facts of *Williams* and the language of the indemnity agreement interpreted in that opinion are significantly different from those here at issue.

In *Williams*, the court was interpreting an alleged oral agreement for indemnification arising when a ditch was being dug on a construction site. The contractor digging the ditch apparently was uneasy about the possibility of a collapse. The representative of another entity on the site supervising the digging stated that "we will take care of it if anything happens." Both the trial court and supreme court found these words were ambiguous and did not create a contract of indemnity.

The situation here is so far different from that in *Williams* as to make that case of no relevance. In *Williams*, there was a terse oral statement; here, there was a lengthy all-encompassing written paragraph. There, the alleged indemnity agreement was brief and uttered hastily on the spot by a layman with little time for reflection; here, the agreement was a product of negotiation in which legal advice was available at each step. In *Williams*, the parties were laymen; here, they were sophisticated business people. *See Glaspell v. Ohio Edison Co.*, 29 Ohio St.3d 44, 505 N.E.2d 264 (1987).

I would reverse the judgment and remand with directions to enter judgment in favor of Public Service Company.