**Mary RODRIGUEZ, et al., Plaintiffs,**

**v.**

**OLIN CORPORATION, Defendant-Appellee and Third Party Plaintiff-Appellant,**

**v.**

**HUNTER CHEMICALS, INC., Defendant-Appellant,**

**Smith Valve Corporation, Third Party Defendant-Appellee.**

No. 85–4031.

United States Court of Appeals, Fifth Circuit.

Jan. 8, 1986.

Rehearings Denied Feb. 14, 1986.

Brame, Bergstedt & Brame, John E. Bergstedt, Lake Charles, La., for defendant-appellant.

Scofield, Bergstedt, Gerard, Mount & Veron, John B. Scofield, Richard M. Perles, Lake Charles, La., for Olin Corp.

Plauche, Smith & Nieset, James R. Nieset, Lake Charles, La., for Smith Valve.

Before GARZA, POLITZ, and HILL, Circuit Judges.

GARZA, Circuit Judge:

## FACTS AND PROCEEDINGS BELOW

This appeal arises from an accident that occurred at the Olin Corporation ("Olin") chemical manufacturing plant in Lake Charles, Louisiana. One of the many units at the plant produces toluene diisocyanate ("TDI"), a material used to produce urethane foam, which in turn is used in the production of furniture, carpet padding, pillows, mattresses and insulation. One of the ingredients used to make TDI is phosgene, which is composed of chlorine gas and carbon monoxide.

Smith Valve Corporation ("Smith") manufactures a number of different kinds of valves, including a one-half inch split-body valve made from austinitic stainless steel. The two halves of this split-body valve are held together by four external stainless steel bolts and nuts. Although the plans and specifications of the Lake Charles plant called for the use of one-half inch "monel" solid body valves in the TDI unit, a Smith stainless steel valve was used as part of an assembly that connected a pipe carrying phosgene liquid to a gauge which measured the pressure of phosgene in the pipe. Monel and stainless steel are corrosive resistant alloys.

On the morning of June 2, 1982, James Vincent, an operator at Olin's TDI unit, noticed that the gauge in question had developed a leak. Clegg Barton, a maintenance worker for Olin, was summoned to replace the gauge. Barton eventually attempted to disconnect the gauge, in order to "bleed off" any phosgene that may have remained in the small section of pipe on the gauge side of the valve. As Barton was removing the gauge, the four bolts holding the two halves of the valve suddenly broke. The rupture of the valve permitted phosgene liquid to escape from the pipe. Because the boiling point of phosgene is approximately 40° F., some of the phosgene evaporated into the atmosphere before Olin workers were able to contain the leak.

At the time of the leak, Francisco Rodriguez, an employee of Hunter Chemicals, Inc. ("Hunter"), was making a delivery of industrial soaps on Olin's premises pursuant to a contract between Hunter and Olin. While filling one of Hunter's bulk tanks from his tank truck, Rodriguez was exposed to the phosgene gas. He sustained injuries which ultimately resulted in his death.

Rodriguez' survivors filed suit in diversity against Olin and Hunter for the wrongful death of Francisco Rodriguez. Olin then filed a cross-claim against Hunter pursuant to Fed.R.Civ.P. 13(g). Olin claimed that it was entitled to full indemnification based on the indemnity and insurance provisions of its contract with Hunter. Olin, as a third party plaintiff under Fed.R. Civ.P. 14(a), also claimed that it was entitled to full indemnification or contribution from Smith based on the defective design of the split-body valve in question.

Although the plaintiffs subsequently settled their claim, trial proceeded as between Smith and Olin on the issue of responsibility for release of the phosgene gas. Experts for both Olin and Smith had previously determined that each of the bolts had experienced "chloride stress corrosion cracking," a phenomenon that occurred when chloride ions attacked the stainless steel makeup of the bolts, and that this reaction caused the bolts to break. The debate at trial centered on the temperature at which the cracking would occur.

According to Olin's expert, Dr. John Slater, chloride stress corrosion cracking normally occurs only in temperatures of 160° F. or higher. Slater testified that cracking is possible in ambient temperatures when a chloride combines with sulphur. Slater further testified that in this instance chloride ions had combined with sulphur ions from the molybdenum disulfide coating, which had been applied to the valve and bolts. According to Slater, the molybdenum disulfide coating had broken down and had released the sulfide ions. Slater stated

that he had found sulphur on the fracture surfaces and concluded that in the absence of the molybdenum disulfide the bolts would not have cracked.

Smith's experts, Dr. Paul Weihrauch and Robert Bell, testified that chloride stress corrosion cracking is possible at ambient temperatures. Bell also testified that it was not possible for the molybdenum disulfide, as a high temperature coating, to break down and release sulfide ions in the manner suggested by Slater. Smith's experts proposed that "corrosion fatigue entrapment," which occurs when chloride ions become trapped below the surface of a corroded object, caused the bolts to break. Weihrauch added that chloride stress corrosion cracking involving the molybdenum disulfide could not have occurred because he found no sulphur on the fracture surfaces.

Olin attempted to recall Slater as a rebuttal witness to show that sulphur had been found on the fracture surfaces and that Smith's corrosion fatigue entrapment and molybdenum disulfide breakdown theories had no scientific basis. The district court determined that all points on which Slater was to testify had been covered and refused to allow the rebuttal testimony. Olin also moved for a directed verdict pursuant to Fed.R.Civ.P. 41. The court denied Olin's motion. The jury returned a verdict and found no liability on Smith's part.

Subsequently, in Olin's action against Hunter, which followed the district court's severance of Olin's cross-claim from the Rodriguez suit, Olin moved for summary judgment pursuant to Fed.R.Civ.P. 56 on the basis of the indemnity and insurance provisions of the Olin-Hunter contract. The district court granted Olin's motion. The court found, as a matter of Louisiana law, that the terms of the agreement were not ambiguous and concluded that all risks of injury to any of Hunter's employees on Olin's premises, while engaging in any activity required under the Olin-Hunter contract, shifted from Olin to Hunter.

On appeal, Olin claims that the trial court erred in refusing to allow its offer of rebut-tal testimony and in refusing to direct a verdict in its favor. Hunter, in turn, claims that the court erred in granting Olin's motion for summary judgment under the terms of the Olin-Hunter contract.

## OLIN-SMITH

It is well settled that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313, 317 (1962); *Vallot v. Central Gulf Lines, Inc.*, 641 F.2d 347, 350 (5th Cir.1981) (Unit A); *Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir.1979). Moreover, this court has long "observed that questions as to order of proof are committed to the sound discretion of the trial judge." *McVey v. Phillips Petroleum Co.*, 288 F.2d 53, 54, (5th Cir.1961). Thus, the district court's refusal to allow Slater to testify as a rebuttal witness will not be overturned unless such refusal was an abuse of discretion. *See In re Air Crash Disaster Near New Orleans, La., Etc.*, 764 F.2d 1084, 1090 (5th Cir.1985).

As we noted in *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 555 (5th Cir.1979), "[r]ebuttal is a term of art, denoting evidence introduced by a *plaintiff* to meet new facts brought out in his opponent's case in chief." (emphasis in original). *See also Mersel v. United States*, 420 F.2d 517, 520 (5th Cir.1970); *McVey*, 288 F.2d at 54. There is no question that Olin intended to proffer evidence designed to address matters raised in Smith's case in chief. The only question remaining is whether the points raised were "new."

Olin contends that Smith raised three new matters or theories to which it was entitled to present rebuttal testimony. First, Olin claims that Slater's testimony was necessary to impeach Weihrauch's repeated assertions that no sulfides were found on the fracture surfaces of the bolts. According to Olin, the presence or absence of sulfides was the basis of Weihrauch's

disagreement with Slater's conclusion. Olin maintains that Slater's testimony would have shown that Weihrauch's statements were false, and that the district court's ruling precluded an opportunity to overcome these damaging "misstatements."

■ The question is not whether Olin had an opportunity or right to overcome any statements or misstatements but whether Weihrauch's testimony raised new matters. The record indicates that Slater testified on direct examination that sulphur was found on the fracture surfaces on three related occasions:

Q. What do we have in this exhibit?
Slater: ... And so what we have marked here are the various elements that we found actually on that fracture surface.
Q: This is on the actual fracture surface itself?
Slater: Yes.
Q: Okay.
Slater: So what we see here is a little peak here which corresponds to silicon, a little peak here which corresponds to sulfur, and a very large peak here which corresponds to chlorine.

\*   \*   \*   \*   \*   \*

Q: What does this exhibit reflect here, Doctor?
Slater: Well, this exhibit is a scan ... at this side of the bolt and threads ... this caused a certain amount of interest to try to understand why this sulfur peak was as high as it was on the side of this bolt when the fracture surface was giving anything like the same sort of level of sulfur.

\*   \*   \*   \*   \*   \*

Q: What is this exhibit, Dr. Slater?
Slater: This exhibit presents some data that we found in the literature which was looking at stress corrosion cracking of some, some steels that are not normally considered to be susceptible to stress corrosion cracking even in high temperature environments. And this was prompted by our finding that there was a large amount of sulfur present on the site of the bolts that comprised the accident valve, when this was present actually on the fracture surface.

Olin's assertion that Slater's references to the presence of sulfides was "buried" in a long discussion does not comport with the record.

■ Moreover, even if Weihrauch's statements were untrue and damaging, Olin was not precluded from overcoming Weihrauch's testimony. Olin had an opportunity on cross examination to impeach Weihrauch on the basis of Slater's tests, which were in evidence, and to challenge his conclusions on summation. Olin's suggestion that rebuttal evidence should be allowed where the defendant's testimony is "blatantly wrong" or where the defendant's assertions outnumber the plaintiff's is untenable.

Olin next argues that it was necessary to rebut Weihrauch and Bell's testimony concerning the breakdown of molybdenum disulfide. According to Olin, Bell's testimony that it was not possible for molybdenum disulfide coating to break down and release sulfide ions was inaccurate and constituted a new theory. However, the record reveals that Slater explained the molybdenum disulfide breakdown process at length. The fact that Slater's testimony was elicited on cross examination is irrelevant to whether Bell's molybdenum disulfide breakdown testimony was new. The jury was presented with both Slater and Bell's theories of the breakdown process; rebuttal was not necessary on this point.

Finally, Olin contends that Slater's rebuttal testimony was necessary to impeach Weihrauch's testimony that one exception to chloride stress corrosion cracking occurring in temperatures of 160° F. or higher was "corrosion fatigue entrapment"—a process which, according to Weihrauch, occurs when chlorides become entrapped below the surface scales of a corroded object. Olin asserts that this label constituted a new theory which had not been raised before Smith's case in chief and which had no scientific basis. Olin adds that Weihrauch

implied that corrosion fatigue entrapment may have contributed to the cracking in the bolts and that, therefore, rebuttal testimony on this point was critical. We agree.

At oral argument counsel for Smith maintained that "corrosion fatigue entrapment" is merely an interpretation of the evidence concerning the temperature component aspect of chloride stress corrosion cracking in the bolts. Smith's counsel concluded that because Slater discussed this evidence on direct, cross and redirect examination, Weihrauch's corrosion fatigue entrapment "interpretation" was not new evidence. However, as counsel conceded at oral argument, an expert's opinion or interpretation of evidence is itself evidence. See F.R.E. 703. It follows that Weihrauch's use of the term "corrosion fatigue entrapment," his explanation of the theory underlying the term, and his interpretation of the evidence in this case as supporting— or at least as not contradicting—the corrosion fatigue entrapment hypothesis are certainly evidence. The absence of any such testimony prior to Smith's case in chief undoubtedly renders Weihrauch's testimony "new" for purposes of rebuttal.

Moreover, even if we were to construe Slater's testimony and discussion of the evidence as having encompassed corrosion fatigue entrapment, as Smith suggests, Weihrauch's testimony on this point would still be new. Logic and fairness lead us to conclude that new evidence for purposes of rebuttal does not mean "brand new." Rather, evidence is new if, under all the facts and circumstances, the court concludes that the evidence was not fairly and adequately presented to the trier of fact before the defendant's case in chief. See *Everett v. S.H. Parks and Assocs. Inc.*, 697 F.2d 250, 252 (8th Cir.1983) (plaintiff's evidence "was not truly relevant until [defendant] presented its defense"); *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 459 (2d Cir.1975) ("It is true that [plaintiff's expert] was asked a question on cross examination about [defendant's theory] . . . [but] [t]hat did not make his testimony in response a part of plaintiff's direct case").

We also note that Smith appears to suggest that the availability of pretrial discovery to Olin somehow precludes rebuttal evidence in the case at bar. Such a contention, however, ignores the rule that rebuttal evidence is designed to meet facts not raised before the defendant's case in chief, not facts which *could* have been raised. See *Morgan,* 606 F.2d at 555. This rule proceeds from the view that a plaintiff's has the right to adduce whatever evidence is necessary to establish its prima facie case and is under no obligation to anticipate and negate in its own case in chief any facts or theories that may be raised on defense. See *Weiss,* 515 F.2d at 458–59. See also *Martin v. Weaver,* 666 F.2d 1013, 1020 (6th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). We conclude, therefore, that Weihrauch's testimony on corrosion fatigue entrapment was new, that Olin had no cause or duty to go forward in its case in chief and negate Weihrauch's theory, and that the district court improperly excluded Olin's rebuttal evidence.

Our conclusion that Slater's proposed rebuttal testimony was improperly excluded does not necessarily render the judge's ruling manifestly erroneous, and therefore, reversible as an abuse of judicial discretion. The proposed rebuttal evidence must be central to the plaintiff's prima facie case. See *Weiss,* 515 F.2d at 459. However, we conclude in this instance that Slater's proposed testimony, which Olin submits was designed to discredit Weihrauch's corrosion fatigue entrapment theory, was critical to Olin's case.

Slater testified on direct examination that chloride stress corrosion cracking caused the bolts to break; that chloride stress corrosion cracking does not occur in temperatures under 160° F. in the absence of sulfide ions; that sulfides were found on the fracture surfaces; and that the molybdenum disulfide coating on the valve and bolts broke down, released the sulfide ions and, hence, was the cause of the cracking. Weihrauch, on the other hand, gave testimony on corrosion fatigue entrapment, ex-

plained the theory underlying the term, and proposed corrosion fatigue entrapment as a plausible, alternative theory to Slater's chloride stress corrosion cracking theory. Moreover, in support of this alternative explanation, Bell and Weihrauch testified that the molybdenum disulfide could not have broken down as Slater suggested and that no sulfides were found on the fracture surfaces.

In view of the evidence in the record before us, we must conclude that acceptance of Slater's views on chloride stress corrosion cracking as the better explanation was crucial to Olin's case in chief and that refusal of rebuttal testimony on this point was manifest error. We note that evidentiary matters in trials involving a "battle of experts" are often difficult, and, as the learned judge below recognized, often lead to "reversible error." Although the district judge acted within the appropriate bounds of discretion in almost every instance, we conclude that his decision to refuse Olin the opportunity to rebut and discredit Smith's corrosion fatigue entrapment theory must be reversed.[1]

### OLIN–HUNTER

The district court's decision to grant Olin's motion for summary judgment on the basis of the provisions in the Olin-Hunter contract must be sustained if no genuine issue of material fact existed as to Olin's claim against Hunter. *See* Fed.R.Civ.P. 56; *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980). Hunter contends that the parties only intended to shift risks of liability for injuries resulting from a Hunter employee's performance of work under the contract and not for injuries resulting (1) from pre-existing defects at the Olin plant site and (2) from activities upon which Olin could be held strictly or absolutely liable. Hunter maintains that the intent of the parties under the contract is a disputed question of fact and, therefore, that the district court erroneously granted summary judgment.

Under Louisiana law, where uncertainty or ambiguity exists as to the provisions of a contract, or where the intent of the parties cannot be ascertained from the language employed, resolution of the ambiguity is a question of fact for the jury, and parol evidence regarding the parties' intent is admissible. *Carter's Insurance Agency, Inc. v. Franklin*, 428 So.2d 808 (La.App. 1st Cir.1982), *modified on reh'g*, 428 So.2d 813, 813–14 (La.App. 1st Cir.1983). However, the initial question of whether uncertainty or ambiguity exists is a question of law. *See Battig v. Hartford Accident And Indemnity Co.*, 608 F.2d 119, 120 (5th Cir.1979) ("Absent latent or patent ambiguities, the meaning of a contract is for the court as a matter of law"). Courts are bound to give legal effect to all written contracts where the terms are clear, explicit and lead to no absurd consequences. La. Civ.Code Ann. art. 1945 (West 1977).

The court below concluded that the Olin-Hunter contract, taken as a whole, was clear, unambiguous and reflected the parties' intent to require Hunter to protect Olin against all risks and harms to Hunter's employees, while on Olin's premises and while performing work under the contract. In construing the Olin-Hunter agreement, the court focused on the phrases "all claims, demands ... or suits of any nature whatsoever," "arising out of," "in connection with," and "incidental to" contained in the indemnity provision and on the insurance clause.[2]

---

**1.** Because we reverse the district court's decision to exclude rebuttal testimony, we do not address the court's refusal to direct a verdict in Olin's favor under Fed.R.Civ.P. 41.

**2.** Paragraph 4 of the contract entitled "Indemnity," reads as follows:

(a) Contractor (HUNTER) agrees to protect, indemnify and hold Owner (OLIN) harmless from any and all loss, damage, liability, claims, demands, costs or suits of any nature whatsoever asserted by employees of Contractor or by any third persons (including employees of Owner) for property damage, personal injury or death, or otherwise *in each case arising out of, in connection with or incidental to work performed under this Contract.* This indemnity shall include, without limitation, costs, expenses and attorney's fees occasioned by said loss, damage, liability, claims,

Hunter argues that the indemnity agreement cannot be construed to include claims against Olin for injuries arising from pre-existing defects at the Olin plant site or from Olin's activities. Hunter adds that the language "arising out of, in connection with or incidental to work performed under the contract," can only be construed to encompass claims against Olin for injuries arising from a Hunter employee's activities in the course of performing work under the contract. Hunter contends that this Court's holding in *Mott v. ODECO*, 577 F.2d 273 (5th Cir.) *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1978), requires us to reverse the district court's ruling.

In *Mott* we held that use of the phrase "any and all claims ... incident to, arising out of, in connection with, or resulting from the activities of Subcontractor, its employees and agents" was inadequate as a matter of law to include any claim for

injuries caused by the negligence of the indemnitee or by pre-existing defects. *Id.* at 276–78. However, in *Mott* we only held that the above-quoted phrase was not unambiguous *standing alone*. We stated specifically that "[w]hile another view of the parties' intentions would have been permissible, *see Day v. ODECO*, 353 F.Supp. 1350 (E.D.La.1973), we cannot say on the basis of this record that the trial court's view of the parties' intention is clearly erroneous." *Id.* at 278.

In *Day v. Ocean Drilling And Exploration Co. (ODECO)*, 353 F.Supp. 1350 (E.D. La.1973), the court construed an indemnity agreement which provided indemnification for "any and all claims ... incident to, arising out of, in connection with, or resulting from the activities of Subcontractor, its employees and agents ... or in connection with the work to be performed ... under this contract." *Day* 353 F.Supp. at 1351.

demands or suit, as well as the full amount of any judgment rendered or compromise settlement made, plus court costs and interest.

(b) This indemnity shall apply regardless of whether said loss, damage, liability, claims, demands, costs, or suits are occasioned, brought about or *caused, in whole or in part, by negligence of Owner*, its agents, directors, officers, employees or servants and regardless of whether such negligence being active or passive, primary or secondary.

(c) This indemnity shall insure, by stipulation to the benefit of agents, directors, officers, employees and servants of Owner, and any one of them may exercise this right of indemnity against Contractor independently of Owner or of others.

(d) This indemnity shall not be limited to the amount of insurance required herein.

(emphasis supplied).

Paragraph 5, entitled "Insurance," reads as follows:

5. INSURANCE. (a) Contractor shall procure and maintain, at its expense, the following types of insurance, in amounts at least equal to those specified below, issued by companies meeting Owner's approval: (i) Workmen's Compensation Insurance, including occupational diseases, providing for the payment of statutory benefits as required by law, covering all persons employed by the Contractor on work under the Contract, Employers' Liability Insurance with a minimum limit of $500,000 and Longshoremen's and Harbor Workers' Compensation Act Insurance, if applicable; (ii) Comprehensive General Liability Insurance providing coverage with $1,000,000

single limit for bodily injury and property damage each occurrence, such coverage to include contractual liability and products (including completed operations) and specialized coverage with respect to liability of the Contractor and its subcontractors arising from explosion, collapse and underground damage (SCU); and (iii) Comprehensive Automobile Liability Insurance providing coverage with limits as specified for Comprehensive General Liability Insurance. (b) Owner may revise the types and limits of insurance at any time during the period of this Order. (c) Contractor shall require each subcontractor to provide and maintain Statutory Workmen's Compensation Insurance, Employer's Liability Insurance in the minimum amount of $100,000, Longshoremen's and Harbor Workers' Compensation Act insurance, if applicable, and other types and limits of insurance requested by Owner, covering all persons employed by such subcontractors to be performed under this Order. (d) Contractor shall furnish Owner with certificates issued by the insurance company or companies issuing the insurance policies required by this provision (other than subcontractor's policies) prior to commencement of work. Such certificates shall provide that written notices shall be given to Owner at its office at 120 Long Ridge Road, Stamford, Connecticut 06904, or at its office location that issued this Order if different, at least forty-five (45) days prior to any cancellation or change in any such policy.

The court determined that the contract, "taken as a whole, clearly reflects the parties' intention to require Houma to protect Odeco against all risks of harm to Houma's employees while on the platform, not merely by assuming this risk itself, *but by carrying insurance to cover it." Id.* at 1352–53 (emphasis supplied).

■ As in *Day,* the Olin-Hunter contract requires Hunter to carry insurance to cover the risks it has assumed under the indemnity clause. It follows that the broad indemnity language in the Olin-Hunter contract does not "stand alone," and supports the district court's conclusion that the agreement, taken as whole, requires Hunter to provide Olin with indemnification for injuries arising from pre-existing defects at the Olin plant site. Moreover, although we agree that the phrase "arising out of, in connection with, or incidental to work performed under the contract" can be construed to mean any performance, whether it be by indemnitor or indemnitee, *see Daigle v. Lang,* 377 So.2d 1384, 1391 (La.App. 4th Cir.1979), we conclude that in the context of the whole agreement, including the insurance clause, the court below did not err in determining that the language of the Olin-Hunter agreement encompasses indemnity for injuries arising out of Olin's activities, which are sustained by a Hunter employee, while on Olin's premises and while performing work under the contract.

Hunter argues that it is inappropriate to use an insurance clause to expand the indemnity obligation under the contract and cites our decision in *Seal Offshore, Inc. v. American Standard, Inc.,* 736 F.2d 1078

(5th Cir.1984) in support of its position. However, in *Seal Offshore* we noted that "an insurance provision can ... expansively shift risks." *Seal Offshore,* 736 F.2d at 1081. In any event, the district court did not refer to the Olin-Hunter insurance clause in order to expand Hunter's indemnity obligation, but merely to confirm Hunter's already complete obligation under the indemnity provision.

■ Hunter next asserts that indemnification agreements, as a matter of Louisiana public policy, cannot be construed to indemnify a party against claims based on strict or absolute liability.[3] Hunter notes that it is against Louisiana public policy to enter into a contractual agreement pertaining to wells for oil, gas or water, or for drilling minerals which occur in a solid, liquid, gaseous, or other state, which grants indemnification for sole or concurrent negligent liability or strict liability. *See* La.Rev.Stat.Ann. § 9:2780 (West Supp. 1985). Hunter reasons that it is also contrary to Louisiana public policy to indemnify for strict (and absolute) liability in the present context. We simply cannot agree. The rule that one cannot indemnify for strict liability in the oil and gas and mineral area was developed in the legislature; any extension of this "public policy" into other spheres is one to be undertaken by that body.

■ Hunter also argues that even if risks of strict and absolute liability may be shifted in indemnification agreements, an explicit provision to that effect must be included in the contract. Hunter correctly

---

**3.** In *Kent v. Gulf States Utilities Co.,* 418 So.2d 493 (La.1982), the Louisiana Supreme Court summarized the principles underlying the theory of absolute liability:

Liability for ultrahazardous activities, on the other hand, involves different considerations than [strict] liability under C.C. Art. 2317 for creating or maintaining a thing which presents an unreasonable risk of harm. There are some activities in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, storage of toxic gas, blasting with explosives, crop dust-

ing with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care.

For these particular activities, Louisiana courts have imposed an *absolute* liability (as contrasted to the strict liability previously discussed), which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation.

*Id.* at 498 (citations and footnote omitted) (emphasis in original).

points out that contracts of indemnity will not be construed to indemnify an indemnitee against losses resulting from its own negligence, unless such intention is expressed in unequivocal terms. *Polozola v. Garlock, Inc.*, 343 So.2d 1,000 (La.1977). Hunter concludes that a similar rule of strict construction ought to be applied with respect to strict and absolute liability and cites the recent decision of *Soverign Insurance Co. v. Texas Pipeline Co.*, 470 So.2d 969 (La.App. 1st Cir.), *cert. granted*, 475 So.2d 1097 (La.1985) as authority for its position.

In *Soverign Insurance* the court held that:

> [s]ince the duty imposed on a person under strict and negligent liabilities is the same, there is no rational reason why the rules of construction applicable to indemnification agreements concerning these types of fault should not also be the same. Indeed, because *scienter* is not at issue in strict liability, such liability is easier to prove, and there is a greater risk that the person subject to such liability (whether directly or by an indemnification agreement) will be cast in judgment. As such, strict liability is more *onerous* than negligent liability *on the person assuming it.* If strict liability is more onerous than negligent liability on the party assuming it, it is less likely such person would knowingly assume 'an obligation so extraordinary and harsh.'

*Id.* at 974 (footnote omitted) (emphasis in original).

The court's holding is based on its interpretation of the element of fault underlying strict liability and the policy reasons for the strict liability theory of recovery, as set forth in the seminal decision of *Loescher v. Parr*, 324 So.2d 441 (La.1975). In *Loescher*, Justice Tate, speaking for the court, summarized

> the principle of legal fault [under Articles 2318, 2320, 2321 and 2322] thus already recognized in favor of an injured person himself without fault:

> When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others.

> The *fault* of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others.

*Id.* at 446 (emphasis in original).

We conclude that the *Soverign Insurance* court's reliance on *Loescher*'s analysis of the element of fault underlying the strict liability theory of recovery, as the basis for its holding—that indemnity agreements will not be construed to include indemnification for strict liability, unless explicitly stated in the contract—is misplaced. In *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632–35 (5th Cir.1983) this Court held that a provision indemnifying for any injury "that may arise" encompassed claims based on strict liability. *See also Olsen v. Shell Oil Co.*, 595 F.2d 1099 (5th Cir.) *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979) (indemnity agreement providing that 'contractor agrees to ... indemnify ... Shell ... from and against all claims ... incident to, in connection with

or arising out of, contractor's negligence in performing the operations under this contract' held to include indemnification for damages based on strict liability).

In rejecting reasoning similar to that urged in *Soverign Insurance* we stated in *Hyde* that:

> the [district] court's reasoning is faulty in that the basis for the general rule of not allowing a party to contract against his own negligence is not applicable to strict liability cases in which the owner-custodian may be non-negligent, non-culpable, and even reasonable and careful in his conduct toward others. The basis for the general principle that one should not be able to contract against his own negligence (absent clear specific language to the contrary) is the state's interest in public safety. This interest rests on the fear that one might be careless of another's life and limb, if there is no penalty for carelessness. Articles 2322 and 2317 impose liability on the owner-custodian not because of negligence but because of the relationship of the owner-custodian to a thing that is unreasonably dangerous to others. The owner-custodian may not even know of the defect or have any reason to think the thing defective, as in *Loescher,* a case involving a rotten tree on the owner's premises. In the case of an owner driving piles on his property causing injury to a neighbor's premises, the owner is strictly liable for damages, even though the owner and the independent contractor may have gone to great pains to avoid any negligence in the pile-driving. Social policy demands that of two innocent parties the risk of injury should fall on the owner or custodian of the injury-producing thing. Usually, this policy produces a fair result. The costs, especially in an industrial accident, will fall on the party best able to afford to pay the damages and the party in control able to prevent injury. The liable party will take steps to prevent accident. That party will insure against the risk and pass the costs on to the general public in whose interest the policy arose. The policy considerations underlying the presumption that a party cannot contract against his own negligence have no application to this case.

*Id.* at 632.

██ We cannot concur with the court in *Soverign Insurance* that the strict liability fault described in *Loescher* generates greater societal opprobrium than the fault underlying negligence. On the contrary, we conclude that negligent liability may often be *more onerous* than strict liability because the negligent defendant is always in a position to prevent the harm or injury; the strict liability defendant is often not in such a position. Because the public policy reasons for prohibiting indemnification for negligence, unless explicitly stated in the indemnity agreement, have no application in a strict or absolute liability context, we disagree with the conclusion reached in *Soverign Insurance.*[4] We hold that contracts of indemnity may be construed to include indemnification for strict and absolute liability if the parties intended to cover such liability and their intention is expressed in the agreement as a whole. *Cf. Daigle,* 377 So.2d at 1391. ("An indemnity clause need not include the magic words of negligence if the factual circumstances are such that no other conclusion reasonably can be reached except that negligence of the indemnitee was intended to be included in the indemnity agreement").

We hold that the district court correctly concluded that the Olin-Hunter indemnity agreement is unambiguous and evinces a clear intent to require Hunter to indemnify Olin against all claims, by its employees, including claims for injuries based on strict or absolute liability. The district court's order granting Olin's motion for summary judgment must, therefore, be affirmed.

---

**4.** In addition, we note that *Soverign Insurance* was decided by a divided court, and that the issue raised in that case and in this appeal is currently before the Louisiana Supreme Court. *See Soverign Insurance,* 475 So.2d 1097 (La. 1985). We, of course, fully expect our treatment of the strict liability indemnity issue to comport with that court's forthcoming decision.

## CONCLUSION

In sum, ·we conclude that the district court improperly excluded Olin's proposed rebuttal testimony relating to Smith's corrosion fatigue entrapment theory. Because we find that the proposed rebuttal evidence was crucial to Olin's burden of establishing a prima facie case, we hold that the court's ruling was manifest error and reverse the court's Judgment in this regard.

However, we find that the court correctly determined that the Olin-Hunter contract was unambiguous and reflected the parties' intent to require Hunter to indemnify Olin against all risks and harms to Hunter's employees, while on Olin's premises and while performing work under the contract. We hold, therefore, that the district court's ruling granting summary judgment on the contract in Olin's favor is affirmed.

REVERSED IN PART, AFFIRMED IN PART AND REMANDED.