**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 7, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-60580

ELAINE MCAFEE; ET AL.,

Defendants,

ELAINE MCAFEE ET AL.,

Plaintiffs-Appellants,

VERSUS

MURRAY OHIO MANUFACTURING, INC. ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Mississippi

(99-CV-19)

Before DeMOSS, STEWART, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge.[*]

In this Mississippi product liability action, Elaine McAfee

and Michael McAfee sue Murray Ohio Manufacturing Company; Murray,

Inc.; and Wal-Mart Stores, Inc. (collectively "Murray") for

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

injuries Ms. McAfee suffered when the riding lawn mower she was operating overturned, caught fire, and severely injured her. A jury found no liability on the part of the defendants. The McAfees appealed, claiming the presiding magistrate judge made several erroneous evidentiary rulings, improperly instructed the jury, and allowed discovery abuses. We AFFIRM.

I.

Elaine and Michael McAfee purchased a riding lawnmower at a Wal-Mart store. The mower was manufactured by Murray Ohio Manufacturing Company. The mower's battery was located under the seat at the rear of the mower. The fuel tank was located at the front of the mower.

On May 21, 1996, while Ms. McAfee was mowing a slope of her lawn, the mower overturned and caught fire. Ms. McAfee was severely burned and injured. She spent several months in various hospitals recovering. Eventually, however, her lower right leg had to be amputated. Mr. McAfee also suffered some injuries while rescuing his wife.

The parties dispute several facts related to the accident: whether Ms. McAfee was mowing across or up and down the slope; whether the incline of the slope was six to seven degrees, as the McAfees contend, or twenty-five to twenty-eight degrees, as the defendants contend; whether Ms. McAfee was in the process of turning to the left or right; and whether the mower tipped to the left or right. It was undisputed that the mower instructions

2

warned users to mow up and down slopes and to avoid slopes steeper than fifteen degrees, and that neither Ms. McAfee nor Mr. McAfee had read the instructions.

The McAfees sought damages for their personal injuries based on the theories of products liability and negligence.[1] Under their product liability theory, they claimed that the design of the mower was unreasonably dangerous and defective because of design, crashworthiness, and inadequate warnings.[2] In regard to crashworthiness, they argued (1) that the battery was not adequately secured, (2) that gasoline was able to leak from the fuel lines and the vent in the fuel tank cap, (3) such that when the mower overturned the battery shifted, made contact with the battery compartment, and created an electrical arc that ignited the spilled gasoline, and (4) that the deck lever trapped Ms. McAfee's leg after the mower rolled over. In regard to warnings, they argued that Murray failed to alert Ms. McAfee either to the risk of the mower's turning over on a shallow slope or to the consequences of such a turnover. Under their negligence theory, the McAfees

---

[1] Ms. McAfee's insurance providers, Prudential Health Care Plan, Inc., Blue Cross and Blue Shield of Mississippi, and the U.S. Department of Health and Human Services, joined the lawsuit as subrogee plaintiffs. They are not parties to the appeal.

[2] In their complaint, the McAfees listed six bases supporting their product liability theory: (1) the mower was unstable; (2) the warnings failed to advise users of the risk and danger of that instability; (3) the mower did not have a slope indicator; (4) the instructions inadequately addressed the mower's use on slopes; (5) the mower was not crashworthy in the event of an overturn; and (6) as otherwise adduced by the proof.

3

asserted that Murray's negligent design of the mower caused their injuries. Finally, the McAfees sought punitive damages premised on their assertion of the defendants' gross negligence.

Murray disclosed two experts, Raymond Elmy and David Sassaman. Elmy is also the vice president of design/engineering at Murray.

The McAfees disclosed Lanny Rhoades, an accident reconstructionist, as their expert witness. His written report set forth his opinion that the battery mounting system on the mower was defectively designed and that, when the mower overturned, its battery made contact with its metal compartment, causing a spark that ignited a fire. Rhoades based his opinion on his examination of the physical evidence and the scene of the accident; on his reconstruction of the accident, which he had recorded on videotape; and on his survey of lawnmowers of approximately the same vintage and model as the one involved in Ms. McAfee's accident.

Several months before trial, Murray moved the court to exclude Rhoades' testimony in whole or in part. It argued that Rhoades was not an expert in lawnmower design; that his opinions were based on a faulty re-creation of the accident; and that any probative value of his testimony was substantially outweighed by its prejudicial effect. In particular, Murray challenged what it said were significant differences between the reconstruction and the accident: (1) the fuel lines on the exemplar mower (i.e., the mower used in Rhoades' reconstruction) leaked, whereas there was no evidence of such leaks on the McAfee mower; (2) the battery on the

4

exemplar mower moved freely in its compartment, whereas the battery on the McAfee mower was anchored firmly in place the last time it was serviced; (3) Rhoades allowed fuel to collect several minutes before manually igniting it, whereas Ms. McAfee said the fire started immediately after the mower turned over; and (4) the exemplar mower's fuel tank was three-quarters full, whereas the evidence indicated that the McAfee mower was likely almost out of gas at the time of the accident. The McAfees' response to the motion to exclude did not substantively address Murray's contention that the reconstruction was not true to the facts of the accident. Rather, it enumerated Rhoades' professional credentials; explained Rhoades' examination of the physical evidence and the accident scene; and attacked Murray's expert, Elmy. Nonetheless, the trial court denied Murray's motion on the briefs without hearing oral arguments or additional evidence, concluding that the differences between the reconstruction and the accident could be brought out through examination.[3]

In a separate pretrial motion, Murray moved the court to exclude testimony about Rhoades' field survey of lawnmowers. Rhoades surveyed various lawnmowers found in junkyards to check for evidence of arcing within the battery compartment, battery

---

[3] The court also found that Rhoades was qualified "by virtue of his knowledge, education, and training"; that Murray had failed to show that his theories had not been tested or were otherwise unreliable; and that neither his testimony nor the videotape of the accident reconstruction was overly prejudicial.

restraint system failure, fuel-line degradation, and alternative design feasibility. The court ruled that Rhoades could not use the survey to prove his arcing theory because there was no evidence that the mowers surveyed were substantially similar to the McAfees' mower. It allowed the survey to be used to show the availability of other designs, however. In denying the McAfees' motion for reconsideration, the court further explained the basis for its ruling: "Rhoades provided no evidence regarding the junkyard mowers concerning their maintenance history, whether they had ever been modified, or when and why they had been abandoned. Indeed, not all the mowers examined were manufactured by Murray."

On the third day of trial, during the McAfees' case, the court reversed its pretrial ruling and prohibited Rhoades from testifying in any fashion about his reconstruction of the accident. It also excluded the videotape of the reconstruction. The transcript shows that the court based its revised ruling on the sworn testimony it had heard during the trial. The court still allowed Rhoades to testify and to offer his opinions, based on his examination of the physical evidence, that the mower had rolled to the right, that the deck lever had trapped Ms. McAfee, and that the fire was made possible by the design of the fuel system and the battery restraint system. Rhoades testified at length, beginning one afternoon and finishing the following afternoon. His testimony takes up 246 pages of the trial transcript.

After the McAfees rested, Murray moved for judgment as a

matter of law. The court granted the motion as to the McAfees' inadequate warning theory and their request for punitive damages.[4] It denied the motion as to the McAfees' crashworthiness theory and their negligence theory.

Murray called only one witness, Elmy. After Murray rested, the McAfees attempted to call Jimmy Dixon to rebut Elmy's contention that Murray had no knowledge of an arcing problem in its lawnmowers. Dixon, who is a lawnmower repairman specializing in Murray mowers, was not present in the courtroom at the time. The court prevented the McAfees from calling Dixon, stating that he was not a proper rebuttal witness and had not been identified as a witness on the final pretrial order. The McAfees then attempted to call Sassaman to rebut Elmy's testimony that the mower had overturned to the left. The court sustained the defendants' objection, concluding Sassaman was not a proper rebuttal witness. The parties then rested.

The jury deliberated for about eight hours before sending the court a message stating, "If we find that it was not Murray's fault that the mower turned over, do we deliberate further?" The court told the jurors to reread the instructions given. Near the end of the second day of deliberations, the jury indicated it was

_____

[4] The court also granted the motion as to any theory about the mower's stability or instability. In response to Murray's motion for judgment as a matter of law, the McAfees's counsel stated that the issue of stability was inherent in their other theories but did not constitute "an independent ground of [design] defect."

deadlocked.  The judge gave an <u>Allen</u>-type supplemental charge. Thirty minutes later, the jury returned a verdict finding no liability on the part the defendants.

The court ordered that judgment be entered in favor of the defendants.  After the judge denied their motion for a new trial, the McAfees appealed.

## II.

The McAfees challenge six evidentiary rulings.  These we review for abuse of discretion.[5]  "We 'will not disturb an evidentiary ruling, albeit an erroneous one, unless it affects a substantial right of the complaining party.'"[6]

## A.

The McAfees contend that the magistrate judge improperly limited the scope of their expert's testimony <u>in media res</u>, after qualifying him in a pretrial order.  Minutes before Rhoades was to have taken the stand, the court reversed its earlier ruling and excluded the videotape of the reconstruction; the exemplar mower, which the McAfees planned to bring into the courtroom; and any testimony about the reconstruction.  The court concluded that the reconstruction altered the facts of the accident and relied on speculation.  The McAfees assert that the change of ruling not only

---

[5] <u>Guillory v. Domtar Indus., Inc.</u>, 95 F.3d 1320, 1329 (5th Cir. 1996).

[6] <u>Id.</u> (quoting <u>Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.</u>, 993 F.2d 1201, 1208 (5th Cir. 1993)).

was unjustified but also introduced court-induced prejudice. We reject both assertions.

The McAfees first contend that the court's mid-stream revision of its previous evidentiary ruling was not justified by the evidence before it. We faced a similar situation in <u>Guillory v. Domtar Industries, Inc.</u>, a products liability case involving a forklift accident. In that case, on the sixth day of trial, the district court reversed its prior decision and disallowed certain testimony by the defendants' accident reconstruction expert.[7] The court had initially refused to exclude models, exhibits, photographs, and a videotape prepared by the expert based on his reconstruction, instead instructing the plaintiff to challenge the reliability of the evidence through cross-examination. At the time, the court informed the parties that it would revisit the issue. After hearing some of the expert's testimony at trial, the court limited the scope of his testimony and excluded the videotape. The court explained that the expert's conclusions "were not sufficiently grounded in scientific methodology or the facts as presented in the testimony of other witnesses," and that the forklift model depicted in the reconstruction videotape "was not sufficiently similar to the forklift which caused the accident."[8] We found no error, concluding that the court "properly excluded

---

[7] <u>Id.</u> at 1331–32.

[8] <u>Id.</u> at 1330.

9

[the expert's] testimony, which was not based upon the facts in the record but on altered facts and speculation designed to bolster [the defendant's] position."[9]  Indeed, we stated that the court would have abused its discretion if it had not reconsidered its previous decision in the light of later-developed evidence that demonstrated that the decision was erroneous.[10]

As in Guillory, the trial court in this case had a duty to evaluate the relevance and reliability of all expert testimony before allowing its presentation to the jury.  Under the Federal Rules of Evidence, expert testimony may be admitted if "(1) [it] is based upon sufficient facts or data, (2) [it] is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[11] It is the duty of the trial court, acting as the gatekeeper of evidence under Rule 702, to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."[12]  This gatekeeping rule applies to all expert testimony.[13]  In carrying out its duty, the court must look to the particular circumstances of

---

[9] Id. at 1331.

[10] Id. at 1332 (citing Xerox Corp. v. Genmoora Corp., 888 F.2d 345 (5th Cir. 1989)).

[11] Fed. R. Evid. 702.

[12] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

[13] Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).

the case to determine "how to test an expert's reliability."[14]  In this respect, "the law grants the trial judge broad latitude."[15]

We conclude that the trial court's revised ruling comported with its duties under Rule 702.  As the court explained, the reconstruction altered the facts of the accident in four significant respects.  The exemplar mower had leaks in its fuel lines, although there was no evidence that the McAfees' mower had such leaks.  Rhoades jiggled the exemplar battery, even though there was no evidence that the McAfees' battery could move about in its compartment.  He allowed fuel to accumulate for several minutes before igniting the fire, whereas Ms. McAfee testified that the fire started instantaneously.  And he manually lit the fuel because he was unable to start it with a spark.  These altered facts justified the court's ruling on the merits.  Indeed, the fact that Rhoades manually started the fire is particularly significant, given that the most fundamental premise of his theory of the accident was that an electrical arc sparked the fire.

Furthermore, the record shows that the court changed its ruling only after hearing sworn testimony that contradicted the factual assumptions underlying Rhoades' reconstruction.  The trial transcript indicates that it based its revised ruling on the testimony that had been developed at the trial:

---

[14] Id. at 150, 152.

[15] Id. at 153.

11

> At the time I ruled on the motion I, of course, considered the defendants' arguments that the reenactment was not substantially similar to what happened in this case. But at that time I also did not have in front of me the sworn testimony that I have now.

Thus, we must reject the McAfees' suggestion that the court had nothing new before it when it changed its ruling.

The McAfees also contend that the court's last-minute reversal introduced court-induced prejudice. In Prudhomme v. Tenneco Oil Co., we recognized that under certain circumstances the actions of a trial court can be so prejudicial to a party as to merit reversal. We concluded in Prudhomme, for example, that the trial court unfairly prejudiced the defendant when, on the morning of trial, it allowed the plaintiffs to amend their complaint to allege a strict liability claim—even though it had three months earlier dismissed the motion to amend. There the court's order had induced the defendant to refrain from preparing a defense to a strict liability cause of action, such that the timing of its new ruling caused prejudice worthy of reversal.[16]

Unlike Prudhomme, the court's change of ruling in this case was not so prejudicial as to merit reversal. The trial transcript shows that the court allowed Rhoades to testify at great length. He was able to explain that his examination of the physical evidence supported his opinions about how the accident happened, and he was allowed to articulate the critical aspects of his arcing

---

[16] 955 F.2d 390 (5th Cir. 1992).

12

theory.  Thus, the value of Rhoades's testimony to the McAfees' case was not irreparably diminished by the limitations imposed by the court.

Finally, we note that the McAfees did not ask for a continuance after the court issued its revised ruling and do not now argue that the court should have ordered a continuance sua sponte.  At best, we could review (on our own initiative) the court's decision not to continue the trial for plain error.[17]  The facts do not support such a finding.  As we concluded above, the court's ruling limited the scope of Rhoades' testimony but neither excluded it nor eviscerated it.  While counsel stated at the time that the court's ruling had "a particular implication" for the plaintiffs' case, the transcript shows that Rhoades nonetheless presented his opinion over the course of an entire afternoon and morning and part of a second afternoon.  We cannot say, therefore, that the trial court committed error, let alone error that cast doubt on the fairness of the proceeding or that seriously affected the McAfees' substantial rights.[18]

---

[17] See United States v. Kizzee, 150 F.3d 497, 500-501 (5th Cir. 2000) (explaining that when a party does not move for a continuance in the trial court, "his assertion [of error] is reversed for plain error only").

[18] In a footnote to their principal brief and again at oral argument, the McAfees also accused the trial court of informing Murray of its revised ruling outside of their presence.  By quoting a lawyer's words out of context, the McAfees have rested on too slim a reed.  Our reading of the transcript in no way supports the McAfees' accusation.

13

Second, the McAfees contend that the court improperly prevented them from using Rhoades' survey to prove that other Murray mowers exhibited signs of arcing; to impeach Elmy's testimony that Murray had no prior knowledge of arcing; and to show Murray's awareness of a dangerous condition. We disagree.

Rule 703, as we explained previously, requires the trial court "(1) to ensure that an expert's testimony rests upon a reliable foundation, (2) to ensure that all scientific testimony or evidence is reliable and relevant, and (3) to exclude scientific evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice."[19] The survey showed that other Murray lawnmowers of the same vintage and/or model exhibited signs of arcing. To the extent that its findings concerned Murray lawnmowers of the same vintage but not the same or a substantially similar model, the survey was irrelevant.[20] To the extent that its findings concerned Murray mowers of the same or a substantially similar model, however, the survey was possibly relevant.

The McAfees contend that the surveyed mowers were substantially similar to the accident mower because all used the

---

[19] Guillory, 95 F.3d at 1330-31 (citing Marcel v. Pladic Oil Co., 11 F.3d 563, 567 (5th Cir. 1994)); see also Daubert, 509 U.S. at 589.

[20] There is no evidence suggesting that the battery restraint system on those mowers was identical to that used on the McAfees' mower.

same type of battery restraint system and had similarly designed grills, headlights, steering wheels, seat mechanisms, deck levers, decks, and fenders.  The one relevant feature in this list is the battery restraint system.  But considering the integrated accident theory advanced by Rhoades, this one characteristic cannot fairly be said to make a group of lawnmowers substantially similar. Moreover, the trial court determined that the McAfees could not account for the maintenance, modification, and abandonment histories of the surveyed lawnmowers—factors that the court deemed to be critical to ascertaining the relevance and reliability of the survey.  According the trial court the deference it is due under the abuse standard, we find no error here.  Indeed, because Rhoades was still allowed to explain his arcing theory to the jury, albeit without referring to his survey, we cannot say that the McAfees' substantial rights would have been affected even if the trial court had erred in excluding the survey.

The McAfees also assert that the survey should have been admitted to impeach the testimony of Murray's expert, Elmy, and to prove Murray's awareness of a dangerous condition.  The survey evidence would not have contradicted Elmy's testimony or shown that Murray was aware of any arcing problem.  Elmy testified that he had no experience with accidents involving battery defects in Murray mowers.  Even assuming the survey showed evidence of a history of arcing, it would not prove that Murray was aware of that problem or that Elmy had testified falsely.  The one case that the McAfees

15

cite does not support their argument. In <u>Shields v. Sturm, Ruger & Company</u>, we stated that reports of product-related accidents submitted to the manufacturer could be introduced to show awareness of a product defect on its part, even if the accidents were not substantially similar to the one at issue.[21] There is no evidence in this case, however, that Murray had any awareness of the history of the mowers surveyed by Rhoades, let alone that any reports of arcing problems in those or other mowers had been submitted to it. In short, the survey showed nothing about Murray's knowledge.

C.

Third, the McAfees contend that the court erroneously allowed Elmy to offer a previously undisclosed opinion that the mower overturned to the left—not to the right, as Elmy had initially stated. The record belies this representation of Elmy's testimony. Elmy stated at his first deposition that he assumed that the mower had overturned to the right. At his second deposition, however, he stated that "It's more likely it turned to the left than to the right, based on the facts as I understand them." Furthermore, the transcript of the second deposition shows that the McAfees' counsel acknowledged receiving notice of the updated basis of Elmy's opinion: "[Y]ou have given me now what I take to be a thorough set of facts that lead you to believe it turned to the left."

---

[21] 864 F.2d 379, 381 (5th Cir. 1989).

16

Accordingly, there was no abuse of discretion here.[22]

D.

Fourth, the McAfees contend that the court improperly prevented them from calling Sassaman, who was listed by Murray as a "will call" witness in the final pretrial order,[23] to rebut Elmy's opinion that the mower rolled over to the left. Rebuttal evidence is generally allowed to counter new facts presented in the defendant's presentation of proof or to rebut evidence unavailable earlier through no fault of the plaintiff.[24] In this context, "new

---

[22] The McAfees changed tacks in their reply brief, arguing that Elmy's testimony was unreliably speculative. We will not consider an argument raised for the first time in a reply brief because it deprives the appellee of the opportunity to respond to it . See Whitehead v. Food Max of Miss., Inc., 163 F.3d 265, 270 (5th Cir. 1998); Knighten v. Commissioner, 702 F.2d 59, 60 n.1 (5th Cir. 1983).

[23] The McAfees accuse Murray of trickery with regard to Sassaman. They suggest that Murray improperly released him without notice in order to prevent them from examining him. This accusation is baseless. Murray was under no obligation to call Sassaman, despite its designation of him as a "will call" witness. The final pretrial order states: "The listing of a WILL CALL witness herein constitutes a representation, upon which opposing counsel may rely, that the witness will be present at trial in the absence of reasonable written notice to opposing counsel to the contrary." The court explained, however, that "all that means is that they have to have him here ready at the courthouse. That doesn't mean that they have to call him." The facts show that Murray failed to accord the McAfees' counsel professional courtesy; however, they do not show trickery.

[24] Tramonte v. Fibreboard Corp., 947 F.2d 762, 764 (5th Cir. 1991); see also Morgan v. Commercial Union Assurance Co., 606 F.2d 554, 555 (5th Cir. 1979) ("Rebuttal is a term of art, denoting evidence introduced by a Plaintiff to meet new facts brought out in his opponent's case in chief.").

17

facts" are those matters that are new to the trier of fact.[25] This follows from the rule that "rebuttal evidence is designed to meet facts not raised before the defendant's case in chief, not facts which <u>could</u> have been raised."[26] The purpose of this rule is to allow the plaintiff to present whatever evidence it deems necessary to making its prima facie case without requiring it to anticipate and negate the defendant's case in its own case in chief.[27] Within these parameters, "[t]he scope of rebuttal testimony is ordinarily a matter to be left to the sound discretion of the trial judge."[28]

The issue we face is not whether the McAfees had a right or an opportunity to overcome Elmy's testimony but whether Elmy's testimony about the direction of the roll raised a new matter.[29] The record shows that it did not. Rhoades testified at length in the McAfees' case in chief about the topic, carefully explaining his opinion that the mower had rolled to the right. It was the McAfees, therefore, who first placed the matter before the jury. Murray obviously used Elmy to respond to Rhoades' testimony about

---

[25] <u>Rodriquez v. Olin Corp.</u>, 780 F.2d 491, 496 (5th Cir. 1986) ("[E]vidence is new if, under all the facts and circumstances, the court concludes that the evidence was not fairly and adequately presented to the trier of fact before the defendant's case in chief.").

[26] <u>Id.</u>

[27] <u>See</u> <u>id.</u>

[28] <u>Tramonte</u>, 947 F.2d at 764.

[29] <u>See</u> <u>Rodriquez</u>, 780 F.2d at 495.

18

the direction of the roll, among other matters.  In any event, on cross-examination, the McAfees had the opportunity to question Elmy about the evolution of his opinion.  In addition, because Elmy's opinion was known to the McAfees well before the trial, Sassaman's testimony was not required to rebut any previously unavailable fact.  In short, Sassaman was not a proper rebuttal witness.  Accordingly, the trial court did not abuse its discretion in excluding his testimony.[30]

### E.

Fifth, the McAfees contend that the court erroneously prevented them from calling Dixon to counter Elmy's testimony that Murray had no prior knowledge of any arcing problem with the lawnmower model owned by the McAfees.  As we explained in the previous section, a court has broad discretion over the presentation of rebuttal evidence.  This discretion is not without bounds and must be tempered "where the probative value of proffered evidence is potentially high and where such evidence, though admissible on the case in chief, was unnecessary for the plaintiff to establish in its prima facie case."[31]

---

[30] Because we find that Sassaman was not a proper rebuttal witness, we need not consider the merits of the McAfees' further assertion that they should have been allowed to call him as an adverse witness even though he had been retained by Murray as an expert.

[31] Weiss v. Chrysler Motors Corp., 515 F.2d 449, 457-58 (2d Cir. 1975) (internal citations omitted), cited in Rodriquez, 780 F.2d at 496.

Dixon apparently would have testified that Murray was aware of arcing problems. Such testimony would certainly have been probative. But it also was a necessary element of the McAfees' prima facie case under Mississippi product liability law.[32] Accordingly, Dixon would not have been a proper <u>rebuttal</u> witness, although he (or someone else) would have been a necessary and proper witness in the McAfees' case in chief. Furthermore, the McAfees failed to disclose Dixon as a possible witness in the pretrial order.[33] For these reasons, and because Dixon was not even available to testify when the McAfees attempted to call him, the court did not abuse its discretion in excluding his testimony.

F.

Finally, the McAfees assert that the judge "subtly over the course of the trial" and erroneously limited evidence of feasible alternative designs to designs available as of 1989, the year the mower was manufactured. This argument is meritless, not least because the McAfees fail to identify any particular adverse

---

[32] Miss. Code Ann. § 11-1-63 (2002) ("In any action alleging that a product is defective because of its design . . . , the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller: (i) [it] knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought. . . .").

[33] <u>See</u> <u>Lirette v. Popich Bros. Water Transp., Inc.</u>, 660 F.2d 142, 144-45 (5th Cir. 1981) ("The trial judge is granted broad discretion in modifying pre-trial orders to admit witnesses not listed in the order.").

20

evidentiary ruling for us to review.  In any event, contrary to the McAfees' argument, the record shows that the court explicitly ruled in a pretrial order that evidence of any design or modification available through the year of the accident, 1996, would be admitted.

III.

The McAfees next contend that the trial court made two errors in instructing the jury.  First, they argue that the instruction on design defect was erroneous.  Second, they argue that the court gave an improper <u>Allen</u> charge.  We disagree on both accounts.

A.

The McAfees complain that the court's charge relating to their design defect claim was abstract and failed to specify the particular defects they alleged.  When a party fails to object to the jury instructions given, as here, we review for plain error.[34] "Failure to object to the jury charge in the trial court precludes review on appeal unless the error is so fundamental as to result in a miscarriage of justice."[35]  When a party complains about the court's failure to give a proposed instruction, it

> must show as a threshold matter that the proposed instruction correctly stated the law.  If a party makes this threshold showing, [it] must then demonstrate that

---

[34] <u>Russell v. Plano Bank & Turst</u>, 130 F.3d 715, 721 (5th Cir. 1997); <u>Barber v. Nabors Drilling U.S.A., Inc.</u>, 130 F.3d 702, 710 (5th Cir. 1997).

[35] <u>Barber</u>, 130 F.3d at 710 (quoting <u>Farrar v. Cain</u>, 756 F.2d 1148, 1150 (5th Cir. 1985)).

21

the actual charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.  But if the charge correctly states the substance of the law, we will not reverse.[36]

Because the McAfees cannot make their required initial showing, we find no error.  The McAfees' proposed instructions merely presented their theory of the case—not the applicable law.  Even if they had made the threshold showing, however, they could not show error, for the court's instruction correctly states the substance of Mississippi product liability law.[37]  We cannot say, therefore, that we harbor a "substantial and ineradicable doubt" that the jury was properly guided by the court's instructions.[38]

## B.

We review the trial court's decision to give a supplemental Allen-type charge in this civil case for abuse of discretion.[39]  A court has wide discretion to determine whether an Allen charge will coerce the jury into returning a verdict it would not otherwise

---

[36] Julian v. City of Houston, Tex., 314 F.3d 721, 727 (5th Cir. 2002) (internal quotations and citations omitted).

[37] Miss. Code Ann. § 11-1-63; Daniels v. GNB, Inc., 629 So.2d 595, 600 (Miss. 1993) (citing Restatement (Second) of Torts, § 402A (1965)).

[38] The McAfees rely on the jury's question to the court—"If we find that it was not Murray's fault that the mower turned over, do we deliberate further?"—in their argument that the instruction was erroneous.  While the question reveals some confusion on the part of the jury, it does not alone establish that the instruction was erroneous.

[39] North Tex. Producers Ass'n v. Metzger Dairies, Inc., 348 F.2d 189, 193 (5th Cir. 1965); see also Allen v. United States, 164 U.S. 492 (1896).

22

reach.[40]  The McAfees assert that the charge given was coercive under the circumstances.  In particular, they note that only thirty minutes elapsed between the charge and the verdict.  Considering that the charge was given towards the end of the second day of deliberations, we do not find the timing of the charge inherently coercive.  Furthermore, considering that we have approved of Allen charges given within seventeen minutes of the verdict, we do not find the rapidity of the verdict after the charge inherently indicative of coercion.[41]  Accordingly, we find no abuse.[42]

IV.

Finally, the McAfees contend that the trial court allowed and even "aided" and "endorsed" various discovery abuses on the part of Murray.  Although their brief chiefly complains about Murray's behavior during discovery, the McAfees implicitly (if only peripherally) challenge four discovery orders.  But they make no effort to identify or analyze the court's errors.  Rather, they merely identify four adverse orders in the course of their narrative about the discovery phase of the lawsuit.  Consequently, we must consider their claims of error related to the trial court's

---

[40] United States v. Gordon, 780 F.2d 1165, 1177 (5th Cir. 1986).

[41] See Bryan v. Wainwright, 511 F.2d 644, 645 (5th Cir. 1975); see also Lowenfeld v. Phelps, 484 U.S. 231, 240 (1988) (finding a supplemental charge given within thirty minutes was not coercive); Montoya v. Scott, 65 F.3d 405, 411 (5th Cir. 1995) (finding that a charge within forty minutes of verdict was not coercive).

[42] We reject the McAfees' additional indication of coercion—that the instruction was generally confusing—based on our previous conclusion that the jury instruction was not erroneous.

23

discovery orders to be abandoned for being inadequately briefed.[43]

Despite our holding grounded in procedure, we have examined the four adverse orders and are satisfied that they present no reversible error on the merits. Each of the orders concerned a request made after the close of discovery on January 21, 2000. Accordingly, they would be reviewed for abuse of discretion.[44]

The first order, issued on February 8, 2000, prohibited the McAfees from continuing their deposition of Elmy for a fourth day. The court concluded that, in the light of its order allowing additional (out-of-time) depositions of other Murray personnel, it was "unnecessary and repetitious for plaintiffs to continue deposing Elmy." It noted that "[p]laintiffs have repeatedly asked the same questions of Elmy which he has been unable to answer." Given the court's assessment of the futility of the McAfees' request, and considering that discovery had already closed, we cannot say that the court's order was an abuse.

The second and third orders, issued on March 15, 2000 and September 21, 2000, denied the McAfees' motion to compel filed on February 9, 2000, and their nearly identical supplemental motion to compel filed on March 1, 2000. The motions complained that Murray had failed to adequately respond to requests for document

---

[43] L&A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994) ("[W]e consider the challenge abandoned for being inadequately briefed.").

[44] Gulf Guar. Life Ins. Co. v. Connecticut General Life Ins. Co., 304 F.3d 476, 488 (5th Cir. 2002).

24

production dated August 3, 1999, and December 20, 1999. On appeal, the McAfees fail to identify any particular aspect of these orders that was in error. In any event, our review has revealed no abuse in either order.

With respect to the August 3 requests, the trial court concluded that the McAfees had waited too long to seek an order to compel production. This decision was not an abuse of the court's discretion to reopen discovery or its authority under its local rules to control discovery. The McAfees received Murray's responses and objections to the August 3 requests on September 3, 1999. Thus, they waited over five months to file their motions to compel. More significantly, they filed the motions after discovery had closed.

The remainder of the motions concerned the requests issued on December 20, 1999. The trial court granted the motions in part and denied them in part. With regard to the portions it denied, the court first explained that it could not compel the disclosure of certain documents that Murray denied existed. Because the McAfees failed to prove that the requested documents did exist, the court did not abuse its discretion. Finally, the court explained that the McAfees' remaining requests were overbroad. Because the McAfees altogether fail to explain how their requests were not overbroad, we find no abuse.

The fourth order, issued on September 22, 2000, granted Murray's motion for a protective order relieving it of any

25

obligation to respond to the multiple discovery requests the McAfees served on February 7, 2000. The court explained that the requests were made after the close of discovery; that the McAfees had long known that Murray's responses to their requests may have been inadequate and therefore could not show cause for their untimely requests; and that the McAfees' fifty-two requests far exceeded the court-ordered limit of thirty discovery requests per side. Again, we find no abuse here.[45]

## V.

For the foregoing reasons, we AFFIRM.

AFFIRMED.

---

[45] Lastly, we reject the McAfees' claim of cumulative error. Because there were no individual errors, we find no cumulative error.